EGERTON, J.
*119 INTRODUCTION
Darren Burley suffered brain death from lack of oxygen due to a cardiac arrest following a prolonged and violent struggle *460 with several deputies of the Los Angeles County Sheriff's Department, who were called to arrest Burley after he assaulted a woman while under the apparent influence of cocaine, *120 marijuana, and PCP. In a wrongful death action brought by Burley's estranged wife and five children (Plaintiffs) against the deputies and the County of Los Angeles (collectively, Defendants), a jury found Deputy David Aviles liable for intentional battery by use of excessive force and Deputy Paul Beserra liable for negligence resulting in Burley's death. The jury attributed 40 percent of the fault to Burley for his own death, and found Deputies Aviles and Beserra each 20 percent at fault, while allocating the remaining 20 percent of fault to the other deputies. The jury awarded Plaintiffs $8 million in noneconomic damages, and the trial court entered judgment against Aviles for the full amount of the award based on the jury's finding that he intentionally harmed Burley.
On appeal, Defendants argue (1) the evidence was insufficient to support the jury's causation findings; (2) multiple irregularities and instances of misconduct by Plaintiffs' attorneys combined to deprive Defendants of a fair trial; (3) the trial court improperly instructed the jury on damages and the evidence was insufficient to support the damages award; and (4) the court erred in holding Deputy Aviles liable for the full noneconomic damages award despite the jury's comparative fault allocation. We agree with Defendants that Civil Code section 1431.2 mandates allocation of the noneconomic damages award in proportion to each defendant's comparative fault, notwithstanding the jury's finding of intentional misconduct. Accordingly, we will direct the trial court to vacate the judgment and enter a separate judgment against Deputy Beserra and the County and a separate judgment against Deputy Aviles and the County, holding them liable for the noneconomic damages award in an amount proportionate to the jury's comparative fault determinations. We find no reversible error on the other grounds.
Plaintiffs B.B., B.B., and T.E. ("Cross-Appellants") filed a cross-appeal from the trial court's order granting Defendants summary adjudication on Cross-Appellants' claims for civil rights violations under Civil Code section 52.1. One plaintiff, T.E., also cross-appeals from the court's order denying her motion for private attorney general fees under Code of Civil Procedure section 1021.5. We conclude the summary adjudication order must be reversed as to the Cross-Appellants, because Cross-Appellants presented sufficient evidence to raise a triable issue as to whether the deputies acted intentionally in interfering with Burley's right to be free from unreasonable seizure. We find no error in the court's order denying the motion for attorney fees.
FACTS AND PROCEDURAL BACKGROUND
In this section we give an overview of the facts necessary to put the disputed issues in context. Additional facts relevant to specific issues are discussed in later sections. Consistent with our standard of review and the rules of appellate procedure, we state the facts in the light most favorable to the judgment. ( Orthopedic Systems, Inc. v. Schlein (2011) 202 Cal.App.4th 529, 532, fn. 1, 135 Cal.Rptr.3d 200.)
*121 On the evening of August 3, 2012, residents of a Compton, California neighborhood heard frantic screams for help and saw a man, later identified as the decedent, Darren Burley, straddling a woman in the street. Two residents confronted Burley and pushed him off the struggling woman, allowing her to flee. Others called 911 to report the incident.
Deputies David Aviles and Steve Fernandez were the first to arrive at the *461 scene. As the deputies approached Burley, he stood up, faced them, and, with a blank stare, began making grunting sounds while moving toward them in slow, stiff, exaggerated robotic movements, leading the deputies to conclude that he might be under the influence of PCP. Aviles ordered Burley to get on his knees facing away from the deputies. Burley did not respond.
Suddenly, a distraught woman ran into the street, pointed at Burley and yelled, "He tried to kill me!" Burley's attention turned to the woman, and as he moved to pursue her, Deputy Fernandez "hockey checked" him, causing Burley to hit his head on a parked truck before falling to the ground.
After a struggle, the deputies maneuvered Burley to a prone position, face-down on the concrete. Deputy Aviles then mounted Burley's upper back, while pinning Burley's chest to the ground with the maximum body weight he could apply. As Deputy Fernandez knelt on Burley's upper legs with all of his weight, Aviles pressed his right knee down on the back of Burley's head, near the neck, and his left knee into the center of Burley's back. Burley struggled against the deputies, trying to raise his chest from the ground.
Carl Boyer witnessed the altercation. He testified that one of the deputies held Burley in some type of "head-lock" during most of the struggle. Boyer also saw a deputy hit Burley in the head several times with a flashlight. He said Burley appeared to be gasping for air.
When Deputy Paul Beserra arrived, Burley was face-down and Deputies Aviles and Fernandez were trying to restrain him. Deputies Timothy Lee, Ernest Celaya, and William LeFevre arrived soon after. Beserra attempted to restrain Burley's left arm, while Lee assisted on the right and Celaya held Burley's feet. Celaya and Lee tased Burley multiple times without apparent effect. Eventually the deputies succeeded in handcuffing Burley and hobbling his legs. Beserra estimated three to four-and-a-half minutes passed between his arrival and Burley's handcuffing. Burley was prone on his stomach the whole time, with Aviles on his back.
While the other deputies disengaged, Deputy Beserra stayed with Burley. Approximately two minutes later, Beserra heard Burley's breathing become labored and felt his body go limp. Beserra did not administer C.P.R.
*122 When paramedics arrived, Captain Jason Henderson of the Compton Fire Department found Burley still face-down on his stomach, with Beserra pressing his knee into the small of Burley's back. Burley had no pulse. Paramedics immediately began treating him with C.P.R., a bag-valve mask connected to an oxygen tank, and an endotracheal tube. After five minutes, they restored Burley's pulse and transported him to the hospital.
Burley never regained consciousness and he died 10 days later. The autopsy report listed the cause of death as brain death and swelling from lack of oxygen following a cardiac arrest"due to status post-restraint maneuvers or behavior associated with cocaine, phencyclidine and cannabinoids intake." The manner of death was marked, "could not be determined."
Three sets of plaintiffs filed lawsuits against the County and deputies: (1) Burley's estranged wife, Rhandi T., and their two children; (2) Burley's two children with Shanell S.; and (3) Burley's child with Akira E. The complaints asserted causes of action for battery, negligence, and civil rights violations under Civil Code section 52.1. Defendants moved for summary adjudication of the civil rights claim. The court granted the motion, and the consolidated cases proceeded to trial on the battery and *462 negligence claims against the County and Deputies Aviles, Fernandez, Beserra, Celaya, Lee, and LeFevre.
After a several-weeks-long trial, the jury returned a verdict finding Deputy Aviles liable for battery and Deputy Beserra liable for negligence. The jury attributed 40 percent of the fault to Burley for his own death, and found Aviles 20 percent at fault, Beserra 20 percent at fault, and the remaining deputies 20 percent at fault. After hearing evidence on damages, the jury awarded Plaintiffs $8 million in noneconomic damages for Burley's wrongful death.
Plaintiffs filed a proposed judgment, which Defendants opposed on the ground that it failed to apportion damages for the two liable deputies according to their percentages of fault. After a hearing on apportionment, the court entered judgment against Deputy Beserra and the County for $1.6 million (20 percent of the damages award) and against Deputy Aviles and the County for the full $8 million award.
Following the denial of Defendants' post-trial motions, Plaintiffs moved for attorney fees under Code of Civil Procedure section 1021.5. The court denied the attorney fee motion. This appeal and cross-appeal followed.
*123 DISCUSSION
1.-3.**
4. Civil Code Section 1431.2 Mandates Comparative Fault Apportionment, Even When Tortious Conduct Is Intentional
Defendants contend the trial court erred by failing to apportion damages according to the jury's comparative fault determinations. Despite the jury's decision to allocate only 20 percent of the fault for Burley's death to Deputy Aviles, the judgment makes him liable for 100 percent of the total noneconomic damages award. Defendants argue this allocation conflicts with the unambiguous mandate of Civil Code section 1431.2 that "[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault." ( Civ. Code, § 1431.2, subd. (a).)[9] We agree, and will therefore direct the trial court to enter a separate judgment against Aviles and the County, imposing liability for the noneconomic damages award in an amount proportionate to the jury's comparative fault determination.
In June 1986, the voters approved an initiative measure, the Fair Responsibility Act of 1986 (codified as sections 1431 to 1431.5 of the Civil Code and popularly known as Proposition 51), which "modified the traditional, common law 'joint and several liability' doctrine, limiting an individual tortfeasor's liability for noneconomic damages to a proportion of such damages equal to the tortfeasor's own percentage of fault." ( Evangelatos v. Superior Court (1988) 44 Cal.3d 1188, 1192, 246 Cal.Rptr. 629, 753 P.2d 585 ( Evangelatos ).) The operative statute provides in relevant part:
"In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate *463 judgment shall be rendered against that defendant for that amount." ( § 1431.2, subd. (a).)
By its terms, section 1431.2 imposes "a rule of strict proportionate liability" on noneconomic damages ( DaFonte v. Up-Right, Inc . (1992) 2 Cal.4th 593, 600, 7 Cal.Rptr.2d 238, 828 P.2d 140 ( DaFonte ) ), under which "each defendant is liable for only that portion of the plaintiff's noneconomic damages which is commensurate with that defendant's degree of fault for the *124 injury" ( Evangelatos, at p. 1198, 246 Cal.Rptr. 629, 753 P.2d 585 ). ( Rashidi v. Moser (2014) 60 Cal.4th 718, 722, 181 Cal.Rptr.3d 59, 339 P.3d 344.)
In determining Deputy Aviles was liable for the entire $8 million noneconomic damages award, the trial court relied upon Thomas v. Duggins Construction Co., Inc. (2006) 139 Cal.App.4th 1105, 44 Cal.Rptr.3d 66 ( Thomas ). Thomas holds that section 1431.2 does not apply to an intentional tortfeasor's liability in a personal injury case. ( Id . at pp. 1112-1113, 44 Cal.Rptr.3d 66.) While the trial court was obliged to follow Thomas as controlling Court of Appeal precedent, we are not bound by the opinion in reviewing the judgment on appeal. (See Sarti v. Salt Creek Ltd. (2008) 167 Cal.App.4th 1187, 1193, 85 Cal.Rptr.3d 506 ["there is no horizontal stare decisis in the California Court of Appeal"].) Because we conclude Thomas conflicts with the plain text of section 1431.2, we decline to follow its holding.
"Issues of statutory construction as well as the application of that construction to an undisputed set of facts are questions of law subject to independent review on appeal." ( Lee v. Silveira (2015) 236 Cal.App.4th 1208, 1214, 187 Cal.Rptr.3d 327.) When construing a statute, we must ascertain the intent of the legislation so as to effectuate the purpose of the law. ( DuBois v. W.C.A.B. (1993) 5 Cal.4th 382, 387, 20 Cal.Rptr.2d 523, 853 P.2d 978.) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.] When ' "statutory language is ... clear and unambiguous there is no need for construction, and courts should not indulge in it." ' [Citations.] The plain meaning of words in a statute may be disregarded only when that meaning is ' "repugnant to the general purview of the act," or for some other compelling reason ....' [Citations.] These principles apply as much to initiative statutes as to those enacted by the Legislature." ( DaFonte, supra, 2 Cal.4th at p. 601, 7 Cal.Rptr.2d 238, 828 P.2d 140.)
In DaFonte , our Supreme Court concluded the plain language of section 1431.2 unambiguously applied in "every case" to shield "every 'defendant' " from joint liability for noneconomic damages not attributable to his or her own comparative fault. ( DaFonte, supra, 2 Cal.4th at p. 602, 7 Cal.Rptr.2d 238, 828 P.2d 140.) The plaintiff in DaFonte was injured at work when he crushed his hand in a mechanical grape harvester. He received benefits from his employer's workers' compensation insurer and sued the harvester's manufacturer for negligence and product defect. ( Id . at p. 596, 7 Cal.Rptr.2d 238, 828 P.2d 140.) At trial, the manufacturer sought to reduce its liability by demonstrating the employer's negligent safety policies were partly responsible for the injury. ( Ibid . ) The plaintiff prevailed, but the jury allocated 45 percent of the fault to his employer, and the trial court commensurately reduced the noneconomic damages award against the manufacturer. ( Id. at pp. 596-597, 7 Cal.Rptr.2d 238, 828 P.2d 140.) The plaintiff appealed, arguing the manufacturer's liability should not be reduced because the employer was immune from *125 tort liability under the workers' compensation law, and *464 the refusal to infer an exception to section 1431.2 would "destroy the 'delicate' preexisting balance among the rights of employee, employer, and third party tortfeasor." ( Id. at p. 603, 7 Cal.Rptr.2d 238, 828 P.2d 140.)
The Supreme Court rejected the DaFonte plaintiff's argument that preexisting law compelled an exception to section 1431.2 's unambiguous directive. The court explained: " Section 1431.2 declares plainly and clearly that in tort suits for personal harm or property damage, no 'defendant' shall have 'joint' liability for 'non-economic' damages, and '[e]ach defendant' shall be liable 'only' for those 'non-economic' damages directly attributable to his or her own 'percentage of fault.' The statute neither states nor implies an exception for damages attributable to the fault of persons who are immune from liability or have no mutual joint obligation to pay missing shares. On the contrary, section 1431.2 expressly affords relief to every tortfeasor who is a liable 'defendant,' and who formerly would have had full joint liability." ( DaFonte, supra, 2 Cal.4th at p. 601, 7 Cal.Rptr.2d 238, 828 P.2d 140.) Further, in rejecting the lower appellate court's interpretation-premised on the reasoning that Proposition 51 amended only the portion of the Civil Code dealing with "Joint or Several Obligations," while leaving other statutory maxims intact-the Supreme Court reemphasized the point: "[S]ection 1431.2 itself contains no ambiguity which would permit resort to these extrinsic constructional aids. The statute plainly attacks the issue of joint liability for noneconomic tort damages root and branch. [¶] In every case , it limits the joint liability of every 'defendant' to economic damages, and it shields every 'defendant' from any share of noneconomic damages beyond that attributable to his or her own comparative fault ." ( DaFonte, at pp. 601-602, 7 Cal.Rptr.2d 238, 828 P.2d 140, italics added.)
Without discussing or even citing the DaFonte opinion, the Court of Appeal in Thomas held that section 1431.2did not shield a defendant found liable for an intentional tort from responsibility for noneconomic damages attributable to the comparative fault of others. ( Thomas, supra, 139 Cal.App.4th at p. 1113, 44 Cal.Rptr.3d 66.) The plaintiffs in Thomas sued the seller of a used scissor lift after they were injured when the lift collapsed at a jobsite. ( Id. at p. 1109, 44 Cal.Rptr.3d 66.) A jury returned a special verdict in favor of the plaintiffs, finding in part that one of the seller's employees made intentionally false representations about the lift's maintenance. ( Id. at pp. 1109-1110, 44 Cal.Rptr.3d 66.) Although the jury allocated only 10 percent of the fault to that employee, the trial court refused to apportion the damages under section 1431.2, ruling the statute was inapplicable to the plaintiffs' fraud cause of action. ( Id. at p. 1110, 44 Cal.Rptr.3d 66.)
In affirming the ruling, the Thomas court observed that, "[a]t the time Proposition 51 was adopted, the law was well established that a tortfeasor who intentionally injured another was not entitled to contribution from any *126 other tortfeasors." ( Thomas, supra, 139 Cal.App.4th at p. 1111, 44 Cal.Rptr.3d 66, citing Code Civ. Proc., § 875, subd. (d).) Further, citing two past cases where "policy considerations of deterrence and punishment" had been invoked to bar reduction of an intentional tortfeasor's liability to reflect another's contributory negligence, the court reasoned the same considerations counseled against construing section 1431.2 to allow an intentional actor to " 'rely on someone else's negligence to shift responsibility for his or her own conduct.' " ( Thomas , at pp. 1112-1113, 44 Cal.Rptr.3d 66, citing *465 Weidenfeller v. Star & Garter (1991) 1 Cal.App.4th 1, 2 Cal.Rptr.2d 14 ( Weidenfeller ) and Heiner v. Kmart Corp. (2000) 84 Cal.App.4th 335, 100 Cal.Rptr.2d 854 ( Heiner ).)[10] Based on these extrinsic aids, the Thomas court concluded, "Proposition 51 did not alter the existing principles governing an intentional tortfeasor's liability to an injured plaintiff." ( Thomas, at p. 1111, 44 Cal.Rptr.3d 66.)
The Thomas court's holding conflicts with our Supreme Court's interpretation of section 1431.2 in DaFonte . As DaFonte teaches, " section 1431.2 itself contains no ambiguity which would permit resort to ... extrinsic constructional aids." ( DaFonte, supra, 2 Cal.4th at p. 602, 7 Cal.Rptr.2d 238, 828 P.2d 140, italics added.) Yet, *127 in spite of the statute's plain declaration that "[e]ach defendant " shall be liable "only" for those "non-economic" damages directly attributable to his or her own "percentage of fault" ( § 1431.2, subd. (a), italics added; DaFonte, at p. 601, 7 Cal.Rptr.2d 238, 828 P.2d 140 ), Thomas invokes extrinsic "principles governing an intentional tortfeasor's liability" to read a limitation into section 1431.2 that is not present in the statutory text. ( Thomas, supra, 139 Cal.App.4th at p. 1111, 44 Cal.Rptr.3d 66.) Just as DaFonte found section 1431.2"neither states nor implies an exception for damages attributable to the fault of persons who are immune from liability" ( DaFonte, at p. 601, 7 Cal.Rptr.2d 238, 828 P.2d 140 ), we likewise find the statute neither states nor implies an exception for damages attributable to the fault *466 of a person who acted intentionally rather than negligently.
The Thomas court's reliance on a different statute governing the right of contribution makes the conflict with DaFonte especially stark. (See Thomas, supra, 139 Cal.App.4th at p. 1111, 44 Cal.Rptr.3d 66, citing Code Civ. Proc., § 875, subd (d).) A right of contribution obtains only where a "judgment has been rendered jointly against two or more defendants." ( Code Civ. Proc., § 875, subd. (a), italics added.) As such, the right has no relevance to a proper construction of section 1431.2, which, as DaFonte makes clear, "plainly attacks the issue of joint liability for noneconomic tort damages root and branch ." ( DaFonte, supra, 2 Cal.4th at p. 602, 7 Cal.Rptr.2d 238, 828 P.2d 140, italics added.)[11]
The Thomas court's reliance on "policy considerations of deterrence and punishment" ( Thomas, supra, 139 Cal.App.4th at p. 1112, 44 Cal.Rptr.3d 66 ) is similarly problematic. Section 1431.1 expressly codifies the purpose of the statutes enacted by Proposition 51 ( DaFonte, supra, 2 Cal.4th at p. 599, 7 Cal.Rptr.2d 238, 828 P.2d 140 ), and it expresses no concern for advancing or preserving liability principles related to deterrence or punishment. Rather, section 1431.1 decries the unfairness and cost of "[t]he legal doctrine of joint and several liability" that "has resulted in a system of inequity and injustice" (§ 1431.1, subd. (a) ), often holding defendants "financially liable for all the damage" even where they are found to share just "a fraction of the fault." (§ 1431.1, subd. (b).) To remedy these inequities, section 1431.1 declares that "defendants in tort actions shall be held financially liable in closer proportion to their degree of fault." (§ 1431.1, subd. (c).) And, to carry this purpose into effect, Proposition 51 added section 1431.2, which mandates that "[e]ach defendant shall be liable only for the amount of noneconomic damages allocated to that defendant in direct proportion to that defendant's percentage of fault." ( § 1431.2, subd. (a) ; DaFonte, at pp. 599-600, 7 Cal.Rptr.2d 238, 828 P.2d 140.)
*128 Consistent with DaFonte , we conclude the unambiguous reference to "[e]ach defendant" in section 1431.2, subdivision (a) mandates allocation of noneconomic damages in direct proportion to a defendant's percentage of fault, regardless of whether the defendant's misconduct is found to be intentional. Applying the plain meaning of the statutory text will effectuate its purpose to prevent unfairness by holding all "defendants in tort actions ... financially liable in closer proportion to their degree of fault." (§ 1431.1, subd. (c).) Because Deputy Aviles's liability is governed by section 1431.2, the judgment must be vacated and separate judgments must be rendered against (i) Deputy Beserra and the County and (ii) Deputy Aviles and the County, in direct proportion to each individual defendant's percentage of fault, as found in the jury's comparative fault determinations. ( § 1431.2, subd. (a).)
5. Plaintiffs' Cross-Appeal
Plaintiffs B.B., B.B., and T.E. cross-appealed from the trial court's order granting Defendants summary adjudication on claims brought under section 52.1, commonly referred to as the "Tom Bane Civil Rights Act" or the "Bane Act." Plaintiff T.E. also cross-appealed from the court's ruling denying her motion for attorney fees under *467 Code of Civil Procedure section 1021.5. Because the evidence presented in connection with the summary adjudication motion was sufficient to raise a triable issue of fact as to whether the deputies deliberately subjected Burley to excessive force, with the specific intent to violate his Fourth Amendment rights, we conclude the court erred in granting summary adjudication against Cross-Appellants' Bane Act claims. We find no error in the court's ruling denying the motion for attorney fees.
a. Defendants were not entitled to summary adjudication on Cross-Appellants' Bane Act claims
The Bane Act provides a civil cause of action against anyone who "interferes by threat, intimidation, or coercion ... with the exercise or enjoyment ... of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." ( § 52.1, subds. (a) & (b).) "Although initially enacted 'to stem a tide of hate crimes' [citation], 'a plaintiff need not allege the defendant acted with discriminatory animus or intent; a defendant is liable if he or she interfered with the plaintiff's constitutional rights by the requisite threats, intimidation, or coercion.' " ( Simmons v. Superior Court (2016) 7 Cal.App.5th 1113, 1125, 212 Cal.Rptr.3d 884 ( Simmons ).) "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." ( Austin B. v. Escondido Union School Dist. (2007) 149 Cal.App.4th 860, 883, 57 Cal.Rptr.3d 454 ( Austin B. ).)
*129 Defendants moved for summary adjudication of Plaintiffs' Bane Act claims on the ground that, under Shoyoye v. County of Los Angeles (2012) 203 Cal.App.4th 947, 959, 137 Cal.Rptr.3d 839 ( Shoyoye ), a plaintiff must show a "threat, intimidation, or coercion" independent of the coercion inherent in an underlying civil rights violation. Because it was undisputed that Defendants had probable cause to arrest Burley, they argued evidence showing they used excessive force in effecting the arrest was insufficient to establish a Bane Act violation. The trial court agreed. Granting summary adjudication of the Bane Act claims, the court ruled that "the alleged coercion is ... inherent in the constitutional violation alleged, the use of excessive force. The statutory requirement of 'threats, intimidation, or coercion' is not met."
In their cross-appeal, Cross-Appellants argue the trial court fundamentally misread Shoyoye . They contend Shoyoye 's independent coercion requirement applies only where the civil rights violation is the result of unintentional or negligent conduct. But where the civil rights violation is intentional , Cross-Appellants argue the statutory requirements of the the Bane Act are met, even if coercion is inherent in the underlying violation. We agree with Cross-Appellants that a more narrow reading of Shoyoye is necessary to conform its holding to the statutory text.[12]
*468 In Shoyoye , the court considered whether negligent but inherently coercive conduct was sufficient to establish a Bane Act violation. There, the plaintiff sued a county after he was lawfully arrested but inadvertently overdetained by 16 days due to a paperwork error. ( Shoyoye, supra, 203 Cal.App.4th at pp. 951-953, 137 Cal.Rptr.3d 839.) Citing "multiple references to violence or threats of violence" in other subdivisions of section 52.1, the Shoyoye court concluded the statute "was intended to address only egregious interferences with constitutional rights, not just any tort," and the "act of interference with a constitutional right must itself be deliberate or spiteful " to establish a Bane Act violation. ( Shoyoye , at p. 959, 137 Cal.Rptr.3d 839, italics added.) Further, the court held intentional conduct was required even when the interference was accomplished through necessarily coercive means. Thus, the Shoyoye court explained, "where coercion is inherent in the constitutional violation alleged, i.e., an overdetention in County jail, the statutory requirement of 'threats, intimidation, or coercion' is not met. The statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself." ( Ibid . )
*130 Defendants and the trial court read this latter holding to require a showing of coercion independent from the coercion inherent in an underlying civil rights violation, even where the defendant acts deliberately or spitefully in interfering with an individual's civil rights. While we acknowledge there is language in Shoyoye to support this view, we find this reading to be inconsistent with the court's actual analysis of the issue. More importantly, this reading conflicts with the Bane Act's statutory text. Accordingly, we reject it.
Although the Shoyoye court seemed to suggest a categorical rule requiring independent coercion whenever coercion is inherent in the underlying civil rights violation, the court's analysis of the statutory text indicates it meant the rule to apply only where the underlying violation (and the incidental coercion that accompanied it) was the product of unintentional or negligent error. Thus, after cataloguing the numerous subdivisions of section 52.1 that referred to "violence or threats of violence," the Shoyoye court observed, "[t]he apparent purpose of the statute is not to provide relief for an overdetention brought about by human error rather than intentional conduct ." ( Shoyoye, supra, 203 Cal.App.4th at pp. 958-959, 137 Cal.Rptr.3d 839, italics added.) Put differently, the court recognized that the Bane Act's "apparent purpose" was to provide relief for an overdetention brought about by intentional conduct and this, standing alone, would be sufficient to establish a violation. (But see Allen v. City of Sacramento (2015) 234 Cal.App.4th 41, 69, 183 Cal.Rptr.3d 654 ( Allen ) [holding allegation of "a wrongful arrest or detention, without more, does not" state a claim for violation of the Bane Act].)[13]
*469 *131 The Shoyoye court's discussion of why the plaintiff in that case failed to prove "independent" coercion lends additional support to our more narrow reading of the court's holding. In explaining why the incidental coercion the plaintiff suffered did not establish a Bane Act violation, the court continually returned to the distinction between intentional interference with civil rights and the negligent interference the plaintiff experienced: "Any intimidation or coercion that occurred was simply that which is reasonable and incident to maintaining a jail. The coercion was not carried out in order to effect a knowing interference with [the plaintiff's] constitutional rights. ... [¶] ... There is no evidence that [the plaintiff] was treated differently than other inmates who were lawfully incarcerated, or that any conduct directed at him was for the purpose of interfering with his constitutional rights." ( Shoyoye, supra, 203 Cal.App.4th at p. 961, 137 Cal.Rptr.3d 839, italics added.) Again, the Shoyoye court's analysis suggests, if the plaintiff had been intentionally overdetained with the knowing purpose of interfering with his right to be free from unreasonable seizure, a Bane Act violation would have been established, even though coercion is inherent in every detention, whether lawful or unlawful. In sum, we read Shoyoye to hold that where an individual is subject to coercion that is incidental to an unintentional or negligent interference with civil rights, the individual must show some additional coercion, independent of that caused by the negligent interference, to establish a Bane Act violation.
This reading of Shoyoye is compelled by the statutory text. As discussed, section 52.1, subdivision (a) unambiguously prohibits "a person or persons, whether or not acting under color of law," from "interfer[ing] by threat, intimidation, or coercion ... with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Nothing in the statutory text exempts conduct that is inherently coercive from this prohibition. (See Austin B., supra, 149 Cal.App.4th at p. 883, 57 Cal.Rptr.3d 454 ["The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the *470 law."].) While we agree with the Shoyoye court that the statutory text requires a knowing interference with civil rights by intentional threats, intimidation, or coercion, any other limitation that might be derived from the *132 nature of the interference-e.g., an interference that is inherently coercive-has no basis in the statute's unambiguous language, and thus can be imposed only by legislative action. (See Venegas v. County of Los Angeles (2004) 32 Cal.4th 820, 842-843, 11 Cal.Rptr.3d 692, 87 P.3d 1 [holding "unambiguous language of section 52.1" referring to " '[a]ny individual' " could not be interpreted "to restrict the benefits of the section to persons who are actual or perceived members of a protected class"; observing, "imposing added limitations on the scope of section 52.1 would appear to be more a legislative concern than a judicial one"].)
The court in Cornell reached largely the same conclusion regarding Shoyoye and the statutory text. The Bane Act claim in Cornell arose from a wrongful arrest. On appeal, the defendants, relying on Shoyoye , argued the evidence was insufficient to establish liability because the plaintiff failed to show a separately coercive act apart from the arrest itself. ( Cornell, supra, 17 Cal.App.5th at p. 795, 225 Cal.Rptr.3d 356.) In rejecting the argument, the Cornell court "acknowledge[d] that some courts ha[d] read Shoyoye as having announced 'independen[ce] from [inherent coercion]' as a requisite element of all [Bane Act] claims," but concluded "those courts misread the statute." ( Cornell , at p. 799, 225 Cal.Rptr.3d 356.) The court explained:
"By its plain terms, [the Bane Act] proscribes any 'interfere[nce] with' or attempted 'interfere[nce] with' protected rights carried out 'by threat, intimidation or coercion.' Nothing in the text of the statute requires that the offending 'threat, intimidation or coercion' be 'independent' from the constitutional violation alleged. Indeed, if the words of the statute are given their plain meaning, the required 'threat, intimidation or coercion' can never be 'independent' from the underlying violation or attempted violation of rights, because this element of fear-inducing conduct is simply the means of accomplishing the offending deed (the 'interfere[nce]' or 'attempted ... interfere[nce]'). That is clear from the structure of the statute, which reads, 'If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion,' a private action for redress is available." ( Id. at pp. 779-800, 225 Cal.Rptr.3d 356, italics omitted.)
While it declined to adopt Shoyoye 's"independent from inherent coercion test," the Cornell court agreed that the Bane Act required " 'more egregious conduct than mere negligence' " to impose liability. ( Cornell, supra, 17 Cal.App.5th at pp. 796-797, 225 Cal.Rptr.3d 356.) In that regard, the court reasoned that "the statutory phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief." ( Id. at p. 800, 225 Cal.Rptr.3d 356.) However, the Cornell court saw "no reason that, in addition, the *133 required 'threat, intimidation or coercion,' whatever form it may take, must also be transactionally 'independent' " from a properly proved civil rights violation. ( Ibid ., italics omitted.)
The Cornell court suggested the "better approach" was to "focus directly on the level of scienter required to support a Section 52.1 claim." ( Cornell, supra, 17 Cal.App.5th at p. 799, 225 Cal.Rptr.3d 356.) Thus, the court held that, where a civil rights violation has been "properly pleaded *471 and proved, the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the [defendant] had a specific intent to violate the [plaintiff's civil rights] , not by whether the evidence shows something beyond the coercion 'inherent' in the [violation]." ( Cornell , at pp. 801-802, 225 Cal.Rptr.3d 356, italics added.)
The Ninth Circuit recently adopted Cornell 's specific intent standard in an excessive force case brought under the Bane Act. ( Reese v. County of Sacramento (9th Cir. 2018) 888 F.3d 1030, 1043 ( Reese ).) In concluding there was "no 'convincing evidence that the [California] supreme court likely would not follow' Cornell ," the appeals court observed, " Cornell correctly notes that the plain language of Section 52.1 gives no indication that the 'threat, intimidation, or coercion' must be independent from the constitutional violation." ( Reese , at p. 1043.) Conversely, "the specific intent requirement articulated in Cornell is consistent with the language of Section 52.1, which requires interference with rights by 'threat, intimidation or coercion,' words which connote an element of intent." ( Reese , at p. 1044.)
Like Cornell and Reese , we conclude that, to establish liability under the Bane Act, a plaintiff must prove the defendant acted with a specific intent to violate the plaintiff's civil rights. (See also Simmons, supra, 7 Cal.App.5th at p. 1127, 212 Cal.Rptr.3d 884.)[14] Here, Cross-Appellants presented sufficient evidence in opposition to *134 Defendants' summary adjudication motion to raise a triable issue of fact on the question of Defendants' intent.
"The Fourth Amendment's prohibition on 'unreasonable ... seizures' protects individuals from excessive force in the context of an arrest or seizure." ( Fetters v. County of Los Angeles (2016) 243 Cal.App.4th 825, 837, 196 Cal.Rptr.3d 848 ; U.S. Const., 4th Amend.; see Graham v. Connor (1989) 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443.) Although Defendants' evidence established as an undisputed fact that they had probable cause to detain Burley, Cross-Appellants' evidence suggested Defendants deliberately subjected Burley to excessive force beyond that which was necessary to make the arrest. Once Defendants' use of force crossed that threshold, their conduct became a coercive interference with Burley's civil rights as *472 proscribed by the Bane Act. Because Cross-Appellants presented sufficient evidence to create a triable issue as to whether Defendants subjected Burley to excessive force with the specific intent to interfere with his Fourth Amendment rights, the trial court erred in granting summary adjudication of Cross-Appellants' Bane Act claims.
b. The trial court properly denied attorney fees under Code of Civil Procedure section 1021.5***
DISPOSITION
The judgment is reversed with respect to the noneconomic damages award against Deputy Aviles, and affirmed in all other respects. On remand, the trial court is directed to vacate the judgment and enter a separate judgment against Deputy Aviles and the County and a separate judgment against Deputy Beserra and the County allocating noneconomic damages to each defendant and the County in direct proportion to each individual defendant's percentage of fault, as found in the jury's comparative fault determinations. ( Civ. Code, § 1431.2, subd. (a).)
The order granting summary adjudication to Defendants on Cross-Appellants' Civil Code section 52.1 claims is reversed, and the matter is remanded to the trial court for further proceedings consistent with the principles expressed in this opinion. The order denying Plaintiffs' motion for attorney fees under Code of Civil Procedure section 1021.5 is affirmed.
*135 The parties shall bear their own costs.
We concur:
EDMON, P. J.
DHANIDINA, J.†

See footnote *, ante .

Further statutory references are to the Civil Code, unless otherwise designated.

Even if the unambiguous text of section 1431.2 were in need of construction, neither Weidenfeller nor Heiner supplies guidance on whether a defendant found liable for an intentional tort should be held responsible for noneconomic damages attributable to the fault of another. In Weidenfeller , the jury assigned fault for the plaintiff's injuries from an assault in a bar parking lot 75 percent to a third party assailant, 20 percent to the bar, and five percent to the plaintiff. (Weidenfeller, supra, 1 Cal.App.4th at p. 4, 2 Cal.Rptr.2d 14.) The plaintiff challenged the apportionment on the ground that the assailant acted intentionally, arguing the clause, "based on principles of comparative fault" in section 1431.2, subdivision (a), restricted the statute's application to cases that did not implicate intentional misconduct. (Id. at p. 5, 2 Cal.Rptr.2d 14.) The court rejected the contention that comparative fault cannot apply where intentional torts are involved (id. at p. 7, 2 Cal.Rptr.2d 14 ), and concluded section 1431.2 limited the bar's liability to 20 percent of the damages. (Weidenfeller, at p. 6, 2 Cal.Rptr.2d 14 ; see also Martin By and Through Martin v. United States (9th Cir. 1993) 984 F.2d 1033, 1039 [agreeing with Weidenfeller , recognizing section 1431.2"literally applies to any personal injury action," and the "clause 'based upon principles of comparative fault,' instructs how 'the liability of each defendant' is to be determined"].) However, because the assailant was not named as a defendant, the Weidenfeller court had no occasion to address whether a defendant found liable for an intentional tort is entitled to apportionment under section 1431.2.
In Heiner , after ruling the defendant waived its claim for apportionment of damages, the court nonetheless commented that, "[i]n any event, it is reasonably clear that apportionment of fault for injuries inflicted in the course of an intentional tort-such as the battery in this case-would have been improper." (Heiner, supra, 84 Cal.App.4th at pp. 348-349, 100 Cal.Rptr.2d 854.) However, the verdict form in Heiner did not distinguish between economic and noneconomic damages, and the court did not consider the applicability of section 1431.2. (Heiner, at p. 343, 100 Cal.Rptr.2d 854.) Moreover, the Heiner court relied exclusively upon comparative fault cases that predated the voters' passage of Proposition 51 in 1986. (See Heiner, at p. 349, 100 Cal.Rptr.2d 854, citing Li v. Yellow Cab Company of California (1975) 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 ; American Motorcycle Ass'n v. Superior Court (1978) 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899 ; Allen v. Sundean (1982) 137 Cal.App.3d 216, 186 Cal.Rptr. 863 ; Godfrey v. Steinpress (1982) 128 Cal.App.3d 154, 180 Cal.Rptr. 95.) The Heiner court's dictum is not persuasive on a point that neither it, nor the authorities it relied upon, addressed.

In any event, Code of Civil Procedure section 875, subdivision (d) demonstrates that when the Legislature intends to preclude intentional tortfeasors from availing themselves of a statutory right, it does so explicitly. (Code Civ. Proc., § 875, subd. (d) ["There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person."].)

" 'We review questions of law as well as orders granting summary adjudication under the de novo standard of review.' [Citation.] Likewise, the interpretation of a statute presents a legal question we review independently." (Angelica Textile Services, Inc. v. Park (2013) 220 Cal.App.4th 495, 504, 163 Cal.Rptr.3d 192.) "A defendant meets his or her burden in a summary adjudication motion 'by negating an essential element of the plaintiff's case, or by establishing a complete defense, or by demonstrating the absence of evidence to support the plaintiff's case.' " (Ibid. ) If the defendant does not meet its initial burden, the court must deny the summary adjudication motion. (Simmons, supra, 7 Cal.App.5th at p. 1124, 212 Cal.Rptr.3d 884.)

The Allen court relied principally upon a Massachusetts case, Longval v. Commissioner of Correction (1989) 404 Mass. 325, 535 N.E.2d 588 (Longval ), to conclude a wrongful detention, without more, does not constitute a coercive interference with the right to be free from unreasonable seizure. (Allen, supra, 234 Cal.App.4th at pp. 68-69, 183 Cal.Rptr.3d 654.) In Longval , the Massachusetts Supreme Judicial Court considered a prisoner's claim under the Massachusetts civil rights law (upon which the Bane Act was modeled) that his rights were violated when he was unlawfully transferred to an administrative segregation unit in another prison without a hearing. (Longval, at p. 590.) The Longval court held that "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the Act," explaining, "[c]onduct, even unlawful conduct ... lacks these qualities when all it does is take someone's rights away directly." (Id. at p. 593.)
Our Supreme Court has warned against using nontextual sources, such as cases interpreting the Massachusetts statute, to reach a construction of the Bane Act that is not supported by its text. (See Jones v. Kmart Corp. (1998) 17 Cal.4th 329, 335, 337, 70 Cal.Rptr.2d 844, 949 P.2d 941 [rejecting "plaintiffs' assertion that because ... the Massachusetts Civil Rights Act of 1979 [citation] provided the model for ... portions of section 52.1... and Massachusetts courts have construed the commonwealth's law to apply against private actors' putative 'violations' of legal guaranties that only limit the state's power, we should so construe section 52.1"; explaining, "[s]ection 52.1's language simply does not support that construction"]; see also Cornell v. City and County of San Francisco (2017) 17 Cal.App.5th 766, 801, 225 Cal.Rptr.3d 356 (Cornell ) [in interpreting California's Bane Act, "we are not obliged to follow the construction the Supreme Judicial Court of Massachusetts placed on the [Massachusetts Civil Rights Act] in what appears to be some brief, fugitive dicta at the end of the opinion in [Longval ]"].) Because the Bane Act's text plainly prohibits deliberate interference with an individual's civil rights by threat, intimidation, or coercion, we disagree with Allen and Shoyoye to the extent they hold an intentional unlawful arrest is insufficient to establish a Bane Act violation.

The court in Simmons reached a similar conclusion regarding a deliberate and inherently coercive interference with a criminal suspect's Fourth Amendment rights. In Simmons , the plaintiff presented evidence that, after he was lawfully detained, the two arresting officers punched him several times when he posed no danger, pulled his underwear into a " 'wedgie,' " and subjected him to a roadside anal cavity search on suspicion that he possessed drugs. (Simmons, supra, 7 Cal.App.5th at pp. 1120-1121, 212 Cal.Rptr.3d 884.) In reviving the plaintiff's Bane Act claim after the trial court granted summary judgment, the Simmons court ruled that, "[e]ven assuming the officers had probable cause to arrest [the plaintiff], the complained-of conduct asserted here-multiple nonconsensual, roadside, physical body cavity searches-is necessarily intentional conduct that is separate and independent from a lawful arrest for being in a park after it closed, for riding a bicycle in the dark without a headlight, or for resisting a peace officer." (Id. at p. 1127, 212 Cal.Rptr.3d 884, italics omitted.) Although Simmons adopted the Shoyoye court's "separate and independent" framing, the only underlying civil rights violation was the unreasonable search (the precipitating arrest having been indisputably lawful). Nonetheless, despite the fact that "coercion is inherent" in an unreasonable custodial search (Shoyoye, supra, 203 Cal.App.4th at p. 959, 137 Cal.Rptr.3d 839 ), the Simmons court did not require evidence of coercion independent of the civil rights violation, as the complained-of conduct was "necessarily intentional." (Simmons, at p. 1127, 212 Cal.Rptr.3d 884, italics omitted.)

See footnote *, ante .

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.