# IN THE SUPREME COURT OF CALIFORNIA

B.B., a Minor, etc., et al.,
Plaintiffs and Appellants,

v.

COUNTY OF LOS ANGELES et al.,
Defendants and Respondents.


T.E., a Minor, etc., et al.,
Plaintiffs and Appellants,

v.

COUNTY OF LOS ANGELES et al.,
Defendants and Appellants.


D.B., a Minor, etc., et al.,
Plaintiffs and Respondents,

v.

COUNTY OF LOS ANGELES et al.,
Defendants and Appellants.


S250734


Second Appellate District, Division Three
B264946

Los Angeles County Superior Court
TC027341, TC027438 and BC505918

August 10, 2020

Justice Chin authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

Justice Liu filed a concurring opinion, in which Justice Cuéllar concurred.

B.B. v. COUNTY OF LOS ANGELES

S250734

Opinion of the Court by Chin, J.

In this case, we consider the application of Civil Code section 1431.2[1] to tortfeasors held liable for injuries based on the commission of an intentional tort. Here, the intentional tort was a battery that, combined with other factors, tragically led to the death of Darren Burley. While attempting to subdue Burley, deputies from the Los Angeles County Sheriff's Department, after getting Burley facedown on pavement, used their knees to pin him to the ground with as much body weight as possible. One of the deputies — defendant David Aviles — pressed one knee into the center of Burley's back and another onto the back of Burley's head, near the neck. Aviles disengaged after Burley's hands were cuffed behind his back and his ankles tightly cinched together with a nylon cord. But when paramedics arrived, they found Burley, still cuffed and facedown on the pavement, with a different deputy pressing a knee into the small of his back and with no pulse. They restored Burley's

_____

[1] All further unlabeled statutory references are to the Civil Code.

1

pulse through resuscitation efforts, but he never regained consciousness and died 10 days later.[2]

A jury found that Aviles had committed battery by using unreasonable force against Burley. The court later entered a judgment against Aviles for the entire amount of the noneconomic damages the jury awarded — $8 million — even though the jury also found that only 20 percent of the responsibility for Burley's death was "attributable to" Aviles's actions.

On review, the Court of Appeal held that the judgment against Aviles had to be reduced in accordance with the jury's allocation of responsibility to him. (*B.B. v. County of Los Angeles* (2019) 25 Cal.App.5th 115.) It relied on section 1431.2, which provides in relevant part: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-

---

[2] Burley was African American. We are cognizant that the facts of this case bear similarities to well-publicized incidents in which African Americans have died during encounters with police. These incidents raise deeply troubling and difficult issues involving race and the use of police force. But the question plaintiffs raise in this case — whether and how section 1431.2 applies to intentional tortfeasors — does not turn upon either the decedent's race or the fact that a law enforcement officer, rather than a civilian, committed the intentional tort.

economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (§ 1431.2, subd. (a).) This statute, the Court of Appeal held, requires reduction of an intentional tortfeasor's liability for noneconomic damages to the extent that the negligence of other actors — including the plaintiffs, any codefendants, injured parties, and nonparties — contributed to injury. In reaching this conclusion, the court expressly disagreed with the holding in *Thomas v. Duggins Construction Co., Inc.* (2006) 139 Cal.App.4th 1105, 1108 (*Thomas*), that "an intentional tortfeasor is [not] entitled to a reduction or apportionment of noneconomic damages under" section 1431.2, subdivision (a).

We granted review to address this split of authority and to consider section 1431.2's application to intentional tortfeasors. For reasons that follow, we agree with *Thomas* and reverse the judgment of the Court of Appeal in this case.

## I. FACTUAL AND PROCEDURAL HISTORY

On the evening of August 3, 2012, the Los Angeles County Sheriff's Department received a report of an ongoing assault in Compton, California. Upon arriving at the scene, Deputies David Aviles and Steve Fernandez observed Darren Burley approach them in slow, stiff, exaggerated robotic movements with his fists clenched at his sides and a blank stare on his face.

He was foaming at the mouth and making grunting and growling noises. Based on these observations, the deputies suspected Burley might be under the influence of PCP. The deputies ordered Burley to get on his knees facing away from them. Burley did not respond.

A distraught woman suddenly appeared in the street, pointed at Burley and yelled, "He tried to kill me!" She began to flee, and Burley ran after her. Fernandez, in an effort to stop Burley's pursuit and knock him down, "hockey checked" Burley, ramming a shoulder into Burley's side. Burley lost balance and fell, hitting his head on a parked truck and then landing facedown on the pavement. Aviles attempted to handcuff Burley, but Burley resisted. A struggle ensued, during which Burley punched Aviles — who was wearing a bulletproof vest — in the chest and Aviles punched Burley in the face approximately five times. Fernandez came to Aviles's aid, and the two deputies wrestled Burley to the pavement, facedown. As Burley continued to struggle, Fernandez tried "to get [Burley's lower body] pinned to the ground" by kneeling "with all [his] weight on [Burley's] hamstring area." Meanwhile, Aviles tried "to pin" Burley's upper body to the ground by mounting Burley and pressing one knee into the center of his back, at the top of his diaphragm, and another knee down on the back of his head, near the back of his neck. Aviles, who weighed 200 pounds, used "as much [body] weight [as he] was able to apply." Burley struggled, trying to raise his chest from the ground. According

to a witness, one of the deputies — who, from the witness's description, appeared to be Aviles — held Burley in "some type of head-lock" during most of the struggle and was "choking" him.

More deputies arrived on scene and found Burley facedown with Aviles and Fernandez trying to restrain him. Deputy Paul Beserra attempted to restrain Burley's left arm, while Deputy Timothy Lee assisted on the right and Deputy Ernest Celaya held Burley's feet. Celaya "Tasered" Burley multiple times in the calf area, and Lee "Tasered" him once in the rib cage area, all without apparent effect. The deputies eventually maneuvered Burley's hands behind his back and cuffed him. Even though restrained, Burley was still "flinging" and "twisting" his upper body, so Aviles remained on Burley's back, using his "upper body weight" to push down on Burley and "keep him in place." Other deputies applied a "hobble restraint" to Burley's legs by wrapping a nylon cord around his ankles and "cinch[ing] it tight." A witness testified that one of the deputies hit Burley in the head "at least seven to ten times" with a flashlight, and that Burley appeared to be gasping for air.

After Burley was handcuffed and hobbled, all of the deputies disengaged except Beserra, who "took over" from Aviles and "relieve[d]" him of "attempting to control [Burley's] upper body." From that point forward, Beserra was the only deputy to "touch[]" Burley. According to Beserra, he continued to keep Burley "restrained" facedown on the ground because Burley,

5

though "handcuffed and hobbled," was "still violently fighting against the restraints" and thus posed "a threat to himself and to" the officers. During this time, Beserra did not use "any more force" or place any of his weight "on top of" Burley. "After about 30 seconds," Beserra "felt that [Burley] was no longer fighting against the restraints," so he "placed [Burley] on his left side in order to put him in a recovery position" and "to facilitate . . . medical monitoring." About 90 seconds later — or "approximately two minutes" after Burley was handcuffed and hobbled — Beserra heard Burley's breathing become labored. Beserra then "motioned" for the other deputies "to bring . . . over" paramedics, who were already on scene and "about 10 to 20 feet away . . . rendering aid to" the woman Burley had earlier chased. The paramedics responded "immediately," but as they were "walking over to render aid," Beserra felt Burley's body "go limp" and "motionless." This occurred "approximately . . . a minute after [Beserra] placed [Burley] on his side and after [Beserra] heard [Burley's] breathing become shallow."

Baserra's account was sharply contradicted at trial by Jason Henderson, Sr., a fire captain and paramedic with the Compton Fire Department. Henderson testified that when he and other paramedics arrived at the scene, they "got out of [their] rigs and then [immediately] started moving towards where [Burley] was." Henderson did not recall any of the deputies calling them over or indicating that Burley needed help, or any medical personnel treating the woman Burley had

chased; she was already in one of the deputy's vehicle when they arrived. When they reached Burley, he was not "on his side," but was "face down" on the pavement with his hands cuffed behind his back and a deputy "leaning on" him and applying "weight" with a "knee in the small of [his] back." Burley "appeared to be unresponsive," so Henderson "asked the deputy to get off [Burley] and to unhook him" so Burley could be assessed. After Burley was "uncuffed," the paramedics "rolled him over" and "checked his pulse," but could find none. They restored his pulse after five minutes of resuscitation efforts, but he never regained consciousness and died 10 days later. According to the autopsy report, the cause of death was brain death and swelling from lack of oxygen following a cardiac arrest "due to status post-restraint maneuvers or behavior associated with cocaine, [PCP] and cannabinoids intake."

Burley's children and estranged wife, on behalf of themselves and Burley, sued the County of Los Angeles (County) and the deputies, asserting, as here relevant, claims for battery, negligence, and wrongful death (based on the alleged acts of battery and negligence). Regarding Aviles, the jury found in a special verdict that he had committed battery by using unreasonable force against Burley, and that 20 percent of the responsibility for Burley's death was "attributable to" Aviles's use of unreasonable force. The jury also found that Burley himself had been negligent and that he bore 40 percent of the responsibility for his own death. The jury attributed the

remaining 40 percent of the responsibility to the other deputies. Despite this allocation, the trial court entered a judgment against Aviles for 100 percent of the noneconomic damages — set by the jury at $8 million — because his liability was based on commission of an intentional tort: battery.

The Court of Appeal reversed the judgment, holding that section 1431.2 limits the liability for noneconomic damage of *all* defendants — including intentional tortfeasors — to their proportionate share of fault. (*B.B. v. County of Los Angeles*, *supra*, 25 Cal.App.5th 115, 123–128.) The court expressly disagreed with the contrary holding in *Thomas*.

## II.   DISCUSSION

The issue here is the extent of Aviles's liability for " 'non-economic damages,' " which, for purposes of applying section 1431.2, are defined as "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (§ 1431.2, subd. (b)(2).) As set forth above, section 1431.2, subdivision (a), provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct

proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." The question before us is how, if at all, this section applies to intentional tortfeasors like Aviles.

A. *The Statute's Meaning*

Section 1431.2 became part of the Civil Code in June 1986, through the electorate's adoption of Proposition 51, an initiative measure entitled the Fair Responsibility Act of 1986. To interpret a statute enacted by initiative, we apply the same principles we apply to interpret statutes enacted by the Legislature. "We first consider the initiative's language, giving the words their ordinary meaning and construing [them] in the context of the statute and initiative as a whole. If the language is not ambiguous, [then] we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, [then we] may consider ballot summaries and arguments in determining the voters' intent and understanding of [the] ballot measure." (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571.)

Plaintiffs argue that the key language for determining the statute's applicability to intentional tortfeasors is the phrase, "based upon principles of comparative fault." (§ 1431.2, subd. (a).) This phrase, they assert, establishes that the statute, "by

its own terms, . . . requires several liability for non-economic damages only . . . in an action in which comparative fault principles apply." "[W]hen section 1431.2 was enacted," plaintiffs further assert, comparative fault principles "preclud[ed] intentional tortfeasors from reducing their liability based on [another's] negligence," and "nothing in section 1431.2 purports to change [that] long established" rule. Thus, because of the phrase "based upon principles of comparative fault" (§ 1431.2, subd. (a)), the statute should be read "as excluding intentional tortfeasors from profiting from the statute's limitation on damages liability amongst negligent parties."

Defendants, by contrast, assert that the key language in the statute is the phrase, "the liability of *each defendant*." (§ 1431.2, subd. (a), italics added.) The "plain," "clear and unambiguous" meaning of this phrase, they argue, is that the statute "guarantees apportionment to every defendant in a wrongful death case, without exception" and "regardless of the nature of the defendant's wrongdoing." In defendants' view, under canons of statutory construction, the phrase on which plaintiffs rely — "based upon principles of comparative fault" (§ 1431.2, subd. (a)) — "modifies the subject of the sentence — 'the liability of each defendant' — not [the] term 'action' in the preceding clause" of the sentence. As such, it functions, not "as a limitation" on the statute's applicability, but "as an instruction" on "how a defendant's liability should be calculated under the statute — i.e., 'based [up]on principles of

comparative fault.' " In other words, defendants alternatively assert, it "instructs courts how the percentage of fault should be calculated — i.e., according to the proportion of fault determined by the fact-finder." In short, defendants assert, under the "plain and commonsense meaning" of the statute, intentional tortfeasors like Aviles are entitled to reduce their liability based on the negligent acts of others.

We agree with plaintiffs that there are several problems with defendants' textual analysis. First, defendants' assertion that "[t]he statutory text mandates its application to 'each defendant' without exception" is inconsistent with our precedent. In *Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1156 (*Diaz*), we considered the statute's application to a defendant who was liable both vicariously for the actions of its employee and in its own right for its negligence in hiring and retaining the employee. We first explained that, under case law, certain "type[s] of defendant[s] [are] excluded from allocations of fault under Proposition 51." (*Id.* at p. 1158.) "One [such] type," we stated, is "an employer who faces only vicarious liability under the respondeat superior doctrine for torts committed by its employees in the scope of employment. [Citation.] In a case involving such an employer-defendant, the ' " 'universe' of tortfeasors" ' among whom the jury must apportion fault [citation] does not include the employer. Instead, the employer's share of liability for the plaintiff's damages corresponds to the share of fault that the jury allocates to the employee." (*Ibid.*)

This rule, we then held in *Diaz*, applies even where the employer's "own" separate act of "negligence" — such as "negligent entrustment" of a vehicle — contributes to the plaintiff's injury, if "the employer admits vicarious liability for" the employee's "negligent driving." (*Id.* at p. 1152.) *Diaz* establishes that, contrary to defendants' assertions, the phrase "each defendant" in section 1431.2, subdivision (a), does not mean "all defendants, without exception," and the statute's application may, in fact, depend on the basis of the defendant's liability.

In arguing otherwise, defendants ignore *Diaz* and rely principally on *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 600 (*DaFonte*), which predated *Diaz*. The plaintiff in *DaFonte* was injured by a machine he was using while performing his job, and we held that section 1431.2 required reduction of the product manufacturer's liability by the proportion of fault attributable to the negligence of the plaintiff's employer, even though the employer could not be sued for negligence and its liability to the plaintiff was limited to workers compensation benefits. (*DaFonte*, at p. 596.) As relevant to defendants' argument, in reaching this conclusion, we stated: "Section 1431.2 declares plainly and clearly that in tort suits for personal harm or property damage, no 'defendant' shall have 'joint' liability for 'non-economic' damages, and '[e]ach defendant' shall be liable 'only' for those 'non-economic' damages directly attributable to his or her own 'percentage of fault.' " (*DaFonte*,

at p. 601.) It "expressly affords relief to every tortfeasor who is a liable 'defendant,' and who formerly would have had full joint liability." (*Ibid.*, italics omitted.) It "contains no ambiguity [that] would permit resort to . . . extrinsic constructional aids," such as "ballot materials." (*Id.* at p. 602.) It "plainly attacks the issue of joint liability for noneconomic tort damages root and branch. In every case, it limits the joint liability of every 'defendant' to economic damages, and it shields every 'defendant' from any share of noneconomic damages beyond that attributable to his or her own comparative fault." (*Ibid.*) It "plainly limits a defendant's share of noneconomic damages to his or her own proportionate share of comparative fault." (*Id.* at p. 604.)

Notwithstanding these statements, for several reasons, *DaFonte* does not require reduction under the statute of defendants' liability in the case now before us. First, *DaFonte* did not involve an intentional tortfeasor, did not examine the purpose and effect of the phrase "based upon principles of comparative fault" in section 1431.2, subdivision (a), and did not even quote that phrase. Indeed, there was no need in *DaFonte* to focus on or examine this phrase, because that case involved the statute's application to a quintessential comparative fault tortfeasor: a negligent actor. As we have repeatedly observed, " 'cases are not authority for propositions not considered.' " (*American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1039.)

Second, close examination of our *DaFonte* opinion suggests that defendants overstate the breadth of its scope and effect. We rested our analysis there in part on the fact that, "[l]ong before" the statute's enactment, we had held in *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 (*American Motorcycle*), that "[n]either the allocation of fault, nor the amount of a joint and several damage award, 'var[ied] by virtue of the particular defendants who happen[ed] to be before the court.'" (*DaFonte, supra*, 2 Cal.4th at pp. 602–603, quoting *American Motorcycle*, at p. 589, fn. 2.) The holding in *American Motorcycle* we were referencing was that "'the contributory *negligence* of the plaintiff must be proportioned to the combined *negligence* of plaintiff and of all the tort-feasors, whether or not joined as parties . . . whose negligence proximately caused or contributed to plaintiff's injury.'" (*American Motorcycle*, at p. 589, fn. 2 italics added.) "In this context," we stated in *DaFonte*, "the only reasonable construction of section 1431.2 is that a 'defendant['s]' liability for noneconomic damages cannot exceed his or her proportionate share of fault as compared with all fault responsible for the plaintiff's injuries, not merely that of 'defendant[s]' present in the lawsuit." (*DaFonte*, at p. 603, italics omitted.) Given this analysis, *DaFonte* does not establish the statute's applicability in the very different context now before us, involving an intentional, rather than negligent, tortfeasor. On the contrary, *DaFonte*'s analysis suggests that the law's treatment of intentional tortfeasors "before the

enactment of Proposition 51" — i.e., the legal "context" at the time of the measure's adoption — is relevant in determining section 1431.2's meaning in the context at issue. (*DaFonte*, at pp. 602–603.)

Finally, in our subsequent *Diaz* decision, we effectively rejected defendants' expansive reading of *DaFonte*. The plaintiff in *Diaz* argued that section 1431.2, as construed in *DaFonte*, required "inclu[sion]" of a negligent employer "in the ' " 'universe' of tortfeasors" ' to whom the jury will allocate fault," even if the employer is also vicariously liable for the act of its employee. (*Diaz, supra,* 51 Cal.4th at p. 1158.) We disagreed, holding, as noted above, that section 1431.2 does not require, or even permit, a share of liability to be allocated to a negligent employer for its own negligent act if the employer admits vicarious liability for the negligent act of its employee. (*Diaz*, at pp. 1159–1160.) Notably, we quoted *DaFonte* in explaining that the " ' " 'universe' of tortfeasors" ' among whom the jury must apportion fault [citation] does *not* include the employer." (*Diaz*, at p. 1157, italics added.) Thus, *Diaz* makes clear that defendants overstate *DaFonte*'s scope and effect.

The second problem with defendants' plain language analysis is its treatment of the phrase "based upon principles of comparative fault" in section 1431.2, subdivision (a). As noted above, defendants insist that, under canons of statutory construction, the phrase "modifies" the phrase that follows it:

"the liability of each defendant for non-economic damages." (§ 1431.2, subd. (a).) However, plaintiffs argue that under the same canons of statutory interpretation, it is "at least as reasonable" to conclude that the phrase instead modifies "what precedes it, 'any action for personal injury, property damage, or wrongful death.'" In support of their argument, plaintiffs note that "[t]his Court . . . has used [the latter] construction" in several opinions. (See *Diaz, supra,* 51 Cal.4th at p. 1156 [discussing effect of § 1431.2 "[i]n cases 'based upon principles of comparative fault'"]; *Buttram v. Owens-Corning Fiberglas Corp.* (1997) 16 Cal.4th 520, 539 [finding § 1431.2 applicable because the plaintiff's "cause of action . . . [was] based upon 'principles of comparative fault'"]; *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 959, fn. 1 [§ 1431.2 "provides" for proportionate liability as to noneconomic damages "in a tort action governed by principles of comparative fault"); *Richards v. Owens-Illinois, Inc.* (1997) 14 Cal.4th 985, 988 [same]; *DaFonte, supra*, 2 Cal.4th at p. 600 ["section 1431.2 declares that in actions for wrongful death, personal injury, or property damage based on comparative fault, 'the liability of each defendant for non-economic damages shall be several only and shall not be joint'"].) Under this construction, plaintiffs further argue, the statute does not apply to intentional tortfeasors because intentional tort actions "are not based on principles of comparative fault."

Ultimately, we need not decide whether defendants' parsing of the statutory language is correct because their view of the statute's meaning is problematic even if, as they assert, the phrase "based upon principles of comparative fault" (§ 1431.2, subd. (a)) modifies what follows. As noted above, according to defendants, that phrase "supplies only the manner for calculating percentages"; its sole function is to "instruct[] courts how the percentage of fault should be calculated — i.e., according to the proportion of fault determined by the fact-finder." However, as plaintiffs point out, under that reading, the phrase would serve no purpose given that (1) the immediately following clause specifies that "the liability of each defendant for non-economic damages shall be several only and shall not be joint," and (2) the next sentence sets forth detailed instructions for calculating each defendant's share, stating that "[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . ." (§ 1431.2, subd. (a).) Because defendants' construction renders the phrase "wholly without . . . effect," adopting it would be inconsistent with the well-established principle that courts should, if possible, give meaning to every word of a statute and avoid constructions that make any word surplusage. (*People v. Franco* (2018) 6 Cal.5th 433, 437.)

On the other hand, as plaintiffs further argue, there *is* a construction of the statute, even under defendants' parsing of its

language, that is both reasonable and does not render the phrase "based upon principles of comparative fault" superfluous. (See *Rumetsch v. City of Oakland* (1933) 135 Cal.App. 267, 269 [courts should not construe "[w]ords in a statute . . . as surplusage if a reasonable construction can be given them which will give them some force and meaning"].) Under plaintiffs' construction, the phrase functions to "incorporate[]" otherwise "existing 'principles of comparative fault' " into the statute, such that a defendant's liability is "several and not joint" — and subject to apportionment based on percentage of responsibility — only in cases where the extent of that defendant's liability is otherwise determined according to "principles of comparative fault." (§ 1431.2, subd. (a).) In the end, then, we agree with plaintiffs that for purposes of deciding this case, "it is irrelevant whether the phrase 'based upon principles of comparative fault' modifies the word 'actions' or 'liability.' Whatever the referent," the key question is the extent, if any, to which existing principles of comparative fault otherwise apply under the law to intentional tortfeasors.

To that question, we now turn.

B. *Comparative Fault Principles and Intentional Tortfeasors*

Not surprisingly, the parties disagree as to whether, under existing principles of comparative fault, intentional tortfeasors are entitled to a reduction of liability based on the negligent acts

of others.  Plaintiffs assert that California law has never sanctioned application of "principles of comparative fault" in this manner.  Defendants, on the other hand, assert that "[n]o rule in California excludes intentional tortfeasors from a comparative fault analysis," and that no court "had held" before Proposition 51's adoption "that intentional tortfeasors were excluded from the comparative fault doctrine."  Therefore, defendants argue, "the language referencing comparative fault principles in section 1431.2, subdivision (a) cannot be read to exclude intentional tortfeasors from its scope."  As shown below, plaintiffs have the better of the argument.

Since 1872, California law has provided that "[e]veryone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . ."  (§ 1714, subd. (a), as enacted 1872.) Until 1975, this broad principle was significantly limited by the contributory negligence doctrine, which barred *all* recovery if *any* negligent conduct of the injured plaintiff "contributed as a legal cause in any degree to the harm suffered."  (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 808 (*Li*).)  This " 'all-or-nothing rule' " came to be viewed as unjustifiably harsh, because it " 'exonerate[d]' " even " 'very negligen[t]' " defendants " 'for even the slight fault of [their] victim.' "  (*Id.* at p. 810, fn. 3.)

To address this harshness, courts developed several limitations on the contributory negligence doctrine. One relevant limitation was that the doctrine applied only where the defendant was liable on the basis of *negligence*, and was inapplicable where the defendant was liable on the basis of "willful misconduct" (*Li, supra,* 13 Cal.3d at p. 825) or "an intentional wrong" (*Security-First Nat. Bank of Los Angeles v. Earp* (1942) 19 Cal.2d 774, 777). And because battery is an "intentional tort[]," courts held that the contributory negligence defense was "unavailable" to defendants in actions for battery, (*Bartosh v. Banning* (1967) 251 Cal.App.2d 378, 385.) "As between the guilty aggressor and the person attacked the former [could] not shield himself behind the charge that his victim may have been guilty of contributory negligence . . . ." (*Ibid.*)

In 1975, in *Li, supra,* 13 Cal.3d at page 829, we abolished the contributory negligence defense and replaced it with "a system of 'pure' comparative negligence" that "assess[es] liability in proportion to negligence." Under that system, we explained, "liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault" (*id.* at p. 813), meaning "the amount of [their] negligence" (*id.* at p. 829). In setting forth this rule, we also explained that the terms "fault" and "negligence" are interchangeable, the latter "import[ing] nothing more than 'negligence' in the

accepted legal sense."[3] (*Li*, at p. 813, fn. 6.) Thus, the new rule of proportionate liability, we said, applies "in all actions for negligence." (*Id.* at p. 829.) We expressly declined to address the rule's applicability in actions based on willful or intentional misconduct. (*Id.* at p. 826.)

Three years later, in *American Motorcycle*, we considered *Li*'s impact on a tort principle that would later become the target of Proposition 51: the rule of "joint and several liability" for concurrent tortfeasors "who have negligently inflicted the harm." (*American Motorcycle, supra*, 20 Cal.3d at p. 583.) Under this rule, "each tortfeasor whose negligence is a proximate cause of an indivisible injury remains individually liable for all compensable damages attributable to that injury" (*id.* at p. 582), "and the injured person may sue one or all of the tortfeasors to obtain a [full] recovery for his [or her] injuries" (*id.* at p. 587). The defendant in *American Motorcycle* argued that *Li* compelled replacement of the joint and several liability rule with "a new rule of 'proportionate liability,' under which each concurrent tortfeasor who has proximately caused an indivisible

---

[3] Long before *Li*, California precedent held in the tort context that the terms "fault" and "negligence" were "synonymous." (*Cahill Bros., Inc. v. Clementina Co.* (1962) 208 Cal.App.2d 367, 380; *Marston v. Pickwick Stages* (1926) 78 Cal.App. 526, 534; see *Gackstetter v. Market St. Ry. Co.* (1933) 130 Cal.App. 316, 323 ["The word 'fault' in the instruction was the equivalent of negligence"].)

harm may be held liable only for a portion of plaintiff's recovery, determined on a comparative fault basis." (*American Motorcycle*, at pp. 585–586, italics omitted.) We disagreed, holding that "after *Li*, a concurrent tortfeasor whose negligence is a proximate cause of an indivisible injury remains liable for the total amount of damages, diminished only 'in proportion to the amount of negligence attributable to the person recovering.'" (*Id.* at p. 590.)

We further held, however, that "the principles underlying *Li*" warranted "modification" of a separate common law principle that governed the allocation of loss, not vis-à-vis the plaintiff, but among multiple tortfeasors: the "equitable indemnity doctrine." (*American Motorcycle*, *supra*, 20 Cal.3d at p. 591.) Under "[e]arly California decisions," we explained, a tortfeasor held liable for all of the plaintiff's damages had no "right to contribution" from other tortfeasors who had contributed to the plaintiff's injury. (*Id.* at p. 592.) In later years, out of concern about the "injustice of requiring one tortfeasor to bear an entire loss while another more culpable tortfeasor escaped with impunity," courts "develop[ed] an equitable exception to the no contribution rule" (*ibid.*), which allowed "a 'passively' or 'secondarily' negligent tortfeasor to shift his [or her] liability completely to a more directly culpable party" (*id.* at p. 583). But the "all-or-nothing aspect of" this supposedly equitable exception "ha[d] precluded courts from reaching a just

solution in the great majority of cases in which equity and fairness call[ed] for an apportionment of loss between the wrongdoers in proportion to their relative culpability, rather than the imposition of the entire loss upon one or the other tortfeasor." (*Id.* at p. 595.) " '[T]here is obvious lack of sense and justice,' " we said, " 'in a rule [that] permits the entire burden of a loss, for which two defendants were . . . unintentionally responsible, to be shouldered onto one alone, . . . while the latter goes scot free.' " (*Id.* at pp. 607–608, quoting Prosser, Law of Torts (4th ed. 1971) § 50, p. 307, italics added.) Therefore, we concluded, in order to "attain" the system that *Li* envisioned — " 'under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault' " (*id.* at p. 598) — "the long-recognized common law equitable indemnity doctrine should be modified to permit, in appropriate cases, a right of partial indemnity, under which liability among multiple tortfeasors may be apportioned on a comparative negligence basis" (*id.* at p. 583).

In considering our authority to modify the rule of equitable indemnity, we discussed in *American Motorcycle* a separate but related doctrine: "contribution among tortfeasors." (*American Motorcycle*, *supra*, 20 Cal. 3d at p. 596.) "In traditional terms," we explained, the difference between the two doctrines is that indemnity involves the complete "shift[ing]" of loss "from one tortfeasor to another," whereas contribution involves only the pro rata "shar[ing]" — or "apportionment" — of loss. (*Id.* at p.

591.) Until 1957, California followed the common law rule "denying a tortfeasor any right to contribution whatsoever." (*Id.* at p. 592.) In that year, the Legislature established a statutory "right of contribution among" multiple "defendants in a tort action" against whom "a money judgment has been rendered jointly." (Code Civ. Proc., § 875, subd. (a), added by Stats. 1957, ch. 1700, § 1, p. 3076.) According to the statute's legislative history, the " 'purpose' " of this change was " 'to lessen the harshness of' " the rule prohibiting contribution, which precluded a tortfeasor " 'forced to pay the [plaintiff's] whole claim for . . . damages' " from " 'recover[ing] . . . [a] pro rata share' " from other tortfeasors who had contributed to the injuries. (*American Motorcycle*, at p. 601, fn. 7, italics omitted.) Among other things, the legislative history explained, the common law rule " 'ignore[d] . . . the fact that most tort liability results from *inadvertently* caused damage and leads to the punishment of one wrongdoer by permitting another wrongdoer to profit at his expense.' " (*Ibid.*, italics added.) Consistent with this explanation, the Legislature expressly denied the "right of contribution" to tortfeasors who have "intentionally injured the injured person." (Code Civ. Proc., § 875, subd. (d).) As several appellate courts later observed, this "unequivocal" exclusion of intentional tortfeasors followed "the rule . . . [that] ha[d] been recognized uniformly in all jurisdictions." (*Bartneck v. Dunkin* (1969) 1 Cal.App.3d 58, 61; see *Martinez v. De Los Rios* (1960) 187 Cal.App.2d 28, 34.)

About a month after *American Motorcycle*, in *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 730 (*Daly*), we extended *Li*'s "comparative negligence" principles to "actions founded on strict products liability." In reaching this conclusion, we rejected the argument that because strict liability "is not founded on negligence or fault, [it] is inhospitable to comparative principles." (*Daly*, at p. 734.) We relied in part on the Uniform Comparative Fault Act, which made comparative liability principles applicable in actions " 'based on fault' " and defined the term " ' "Fault" [to] include[] acts or omissions that are in any measure negligent or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability.' " (*Id.* at p. 741, quoting § 1 of the act, italics omitted.) Among the "notable" features of these provisions, we explained, was their use of a term — " 'fault[]' " — that was expressly defined to encompass "negligence and strict liability." (*Id.* at p. 742.) To reflect this usage and our expansion of *Li* to both negligence actions and "actions founded on strict liability," we adopted "the term 'comparative fault' " to describe the doctrine. (*Daly*, at p. 742.)

Two months after *Daly*, in *Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 325 (*Safeway*), we extended *American Motorcycle*'s comparative indemnity doctrine "for apportioning liability among multiple negligent tortfeasors" to actions where the liability of some tortfeasors "rests" on "strict product liability." We reasoned in part that the social policy underlying

strict liability — "assign[ing] liability to a party who possesses the ability to distribute losses over an appropriate segment of society" — "ha[d] never been viewed as so absolute as to require, or indeed as to permit, negligent tortfeasors who have also contributed to the injury to escape all liability whatsoever. Instead, from the initial adoption of strict product liability in [California], the propriety of awarding contribution between strictly liable and negligent defendants ha[d] been uniformly recognized." (*Safeway*, at p. 330.) Applying *American Motorcycle*'s comparative indemnity doctrine in this context would simply "achieve a more precise apportionment of liability . . . by allocating damages on a comparative fault or a comparative responsibility basis, rather than by fixing an inflexible pro rata apportionment pursuant to the contribution statutes." (*Id.* at p. 331.) We also reasoned that a contrary conclusion "would lead to bizarre, and indeed irrational, consequences." (*Id.* at p. 332.) If "only" the "negligent defendant" may invoke the comparative indemnity doctrine, then "a manufacturer who was actually negligent in producing a product would frequently be placed in a better position than a manufacturer who was free from negligence but who happened to produce a defective product, for the negligent manufacturer would be permitted to shift the bulk of liability to more negligent cotortfeasors, while the strictly liable defendant would be denied the benefit of such apportionment." (*Ibid.*) "[N]o policy considerations . . . demand or justify such a result . . . ." (*Ibid.*)

26

In the years between our 1975 decision in *Li* and Proposition 51's adoption in 1986, several published court of appeal decisions addressed the comparative fault doctrine's applicability to willful conduct. In 1976, the Third District Court of Appeal held that *Li*'s "comparative negligence doctrine . . . does not apply to willful misconduct." (*Kindt v. Kauffman* (1976) 57 Cal.App.3d 845, 855.) But courts in the First, Second, and Fifth Appellate Districts, and one federal appellate court, later held otherwise, extending comparative fault principles to tortfeasors liable for willful and wanton conduct. (*Blake v. Moore* (1984) 162 Cal.App.3d 700, 707; *Allen v. Sundean* (1982) 137 Cal.App.3d 216, 226 (*Allen*); *Zavala v. Regents of University of California* (1981) 125 Cal.App.3d 646, 650; *Southern Pac. Transportation Co. v. State of California* (1981) 115 Cal.App.3d 116, 118; *Sorensen v. Allred* (1980) 112 Cal.App.3d 717, 726; *Plyler v. Wheaton Van Lines* (9th Cir. 1981) 640 F.2d 1091, 1093.) In the earliest of these decisions — *Sorensen* — which the later decisions largely followed, the court reasoned that willful and wanton conduct is simply an aggravated "type[] of negligence," which is "suitable for comparison with any other kind of negligence." (*Sorenson*, at p. 725.) As relevant to the issue before us, the *Sorenson* court also relied on the following: (1) our statement in *Li*, which had been endorsed by "[t]he most comprehensive historical and analytical treatise on the subject of comparative negligence," that " 'a comprehensive system of comparative negligence should allow

for the apportionment of damages in all cases involving misconduct which falls short of being intentional' " (*Sorensen*, at p. 722, italics added); (2) our observation in *Daly* that " ' "[t]here is obvious lack of sense and justice in a rule [that] permits the entire burden of a loss, for which two defendants were . . . *unintentionally* responsible, to be shouldered onto one alone, . . . while the latter goes scot free" ' " (*Sorensen*, at p. 724, italics added); and (3) a "legislative study . . . recommend[ing] that the Legislature include recklessness and wilful misconduct *short of intentional injury* among the kinds of fault capable of reducing, but no longer necessarily barring recovery" (*ibid.*, italics added). In one of the decisions that later adopted *Sorensen*'s analysis and conclusion, the court declared that allocation under principles of comparative fault is necessary "[u]nless a defendant has intentionally injured a plaintiff." (*Southern*, at p. 121.)

Consistent with this declaration, decisions before Proposition 51's adoption uniformly held that reduced liability under principles of comparative fault is *not* available to defendants liable for intentional torts. In *Allen, supra*, 137 Cal.App.3d at page 226, the court held that although "comparative fault principles" apply to willful conduct, they do not apply to "the intentional tort of fraudulent concealment." The plaintiff in *Allen* sought recovery for property damage caused by a landslide, and the trial court, as trier of fact, found that the defendant property developer had committed both

"wilful misconduct" and "fraudulent concealment." (*Id.* at p. 220.) The trial court, based on "doubt as to whether comparative fault principles apply" to such conduct, "declined to allocate any portion of the judgment" to a negligent codefendant. (*Ibid.*) The appellate court held that the trial court had erred as to the developer's liability for "wilful misconduct," but had acted correctly regarding "damages attributable to [the developer's] fraudulent concealment." (*Id.* at p. 227.) Regarding the latter conclusion, the appellate court explained: "[T]he Supreme Court in *Li*, and again in *American Motorcycle, used language which appears to exclude intentional torts from the comparative fault system.* Nor has there been support for an extension of comparative fault principles to intentional torts, as there was to wilful misconduct or to strict liability, in other states, among the commentators generally, or in the Uniform Comparative Fault Act. Finally, Code of Civil Procedure section 875, subdivision (d), still provides: 'There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person.' Thus, while there may be sound policy arguments for extending comparative fault principles to intentional tortfeasors [citation], there is as yet no authority to support such an extension." (*Allen*, at pp. 226–227, italics added, fns. omitted.)

In another 1982 decision, *Godfrey v. Steinpress* (1982) 128 Cal.App.3d 154, 176 (*Godfrey*), the appellate court affirmed the trial court's refusal to instruct the jury that an award of damages for infliction of emotional distress and fraud by

concealment could be reduced based on the plaintiffs'
negligence. The appellate court explained in part: "We do not
see how contributory negligence could have any application to
fraud by concealment. The concealment alleged by the
amendment and proved by the evidence was a deliberate,
calculated act by [the defendant]." (*Ibid.*)

In a third 1982 decision — *Phelps v. Superior Court* (1982)
136 Cal.App.3d 802, 815 — the court held that "damages
resulting from intentional torts," including "battery," are not
"subject to apportionment" based on the jury's allocation of fault
among a plaintiff and defendants. The jury in *Phelps* found the
defendants liable for the plaintiff's injuries on "theories of [both]
negligence and battery." (*Id.* at p. 805.) The trial court declared
a mistrial because of "inconsistency in the voting of jurors on
issues pertaining to the comparative negligence issues" (*id.* at p.
804), specifically regarding the "apportionment of fault as
between" the plaintiff and the defendants (*id.* at p. 807). The
plaintiff moved for entry of "a partial interlocutory judgment"
regarding the defendants' liability for battery, arguing (1) there
was no inconsistency in the special verdicts regarding the
defendants' commission of "intentionally tortious" acts, and (2)
the inconsistency "concerning contributory negligence [was]
irrelevant to [that] finding of liability because contributory
negligence is no defense to an intentional tort." (*Ibid.*) The trial
court denied the motion. (*Id.* at p. 808.) Upon a challenge to the
trial court's ruling, the appellate court, retroactively applying

new precedent, held that the liability verdicts on *both* the negligence and intentional tort theories were valid, notwithstanding the inconsistency in the verdicts regarding comparative negligence issues. (*Id.* at pp. 809–812.) However, the court further held that the damage award was problematic because the special verdicts failed to "include a break-down of general damages as between damages resulting from intentional torts (conversion and battery) and damages resulting from negligence." (*Id.* at p. 815.) The damages resulting from negligence, the court explained, "are subject to apportionment, . . . while [the damages resulting from intentional torts] are not. Accordingly, upon retrial . . . , the trier of fact should . . . determine what portion of the total general damages . . . is subject to apportionment of fault and what portion is not." (*Ibid.*)

In sum, by June 1986, when the electorate adopted Proposition 51, the state of the law in California was as follows: This court's precedents established that (1) for purposes of allocating liability under "principles of comparative fault," the term "fault" includes both negligence and strict liability (*Daly, supra,* 20 Cal.3d at p. 744); (2) even where comparative fault principles apply, the liability of codefendants vis-à-vis the plaintiff remains joint and several, subject to reduction based on the plaintiff's conduct (*American Motorcycle, supra,* 20 Cal.3d at p. 582); and (3) under "comparative fault principles," a right of partial indemnity exists as to the defendants in actions based on

negligence and strict liability, such that they may recover from each other on a comparative responsibility basis (*Safeway*, *supra*, 21 Cal.3d at p. 325). Our Courts of Appeal uniformly held that intentional tortfeasors may not, under comparative fault principles, reduce their liability based on the negligent acts of others. And section 875 of the Code of Civil Procedure authorized pro rata contribution among the defendants held liable "in a tort action" (*id.*, subd. (a)), but expressly precluded "contribution in favor of any tortfeasor who has intentionally injured the injured person" (*id.*, subd. (d)).

Published appellate authority after Proposition 51's adoption similarly held that intentional tortfeasors may not obtain reduction of their liability under principles of comparative fault. As noted at the outset, almost 15 years ago, in *Thomas*, *supra*, 139 Cal.App.4th at page 1108, the court confronted the precise issue now before us and held that "an intentional tortfeasor is [not] entitled to a reduction or apportionment of noneconomic damages under Proposition 51." Citing *Allen* and *Godfrey*, the court first explained that "[a]t the time Proposition 51 was adopted, the law was well established" that "a defendant who committed an intentional tort against the plaintiff was not entitled to a reduction of the judgment because the plaintiff's injuries also resulted from his or her own negligence or the negligence of a third party." (*Thomas*, at p. 1111.) The court then held that "Proposition 51 did not alter" this principle. (*Ibid.*)

The *Thomas* court relied in part on *Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 337, which involved the extent of the defendant's liability for a battery committed by its employee — a security guard — against the plaintiff. The defendant in *Heiner* argued on appeal that the trial court had erred by "declining to apply principles of comparative fault to allocate the damages resulting from the battery" (*ibid.*) "based on [the plaintiff's] 'contributory negligence' " (*id.* at p. 348). The Court of Appeal disagreed, finding it "reasonably clear" under California law "that apportionment of fault for injuries inflicted in the course of an intentional tort — such as the battery in this case — would have been improper." (*Id.* at p. 349.) The court reasoned that *Li*'s "adoption of a regime of 'comparative fault' " had not abrogated this rule. (*Heiner*, at p. 349.) On the contrary, the court stated, *Li*, "along with" *American Motorcycle*, *Allen* and *Godfrey*, "constitute an unbroken line of authority barring apportionment where, as here, the defendant has committed an intentional tort and the injured plaintiff was merely negligent." (*Heiner*, at p. 350.)

In support of their contrary view of California law, defendants rely on a single, post-Proposition 51 decision: *Weidenfeller v. Star & Garter* (1991) 1 Cal.App.4th 1 (*Weidenfeller*). According to defendants, the *Weidenfeller* court, in the course of holding that "a negligent defendant was entitled to apportionment under section 1431.2 when a plaintiff's harm was also caused by a non-party who acted intentionally,"

"acknowledged that no authority excluded intentional tortfeasors from the comparative fault doctrine." This decision, defendants assert, "suggests that section 1431.2 should apply to intentional tortfeasors."

Defendants' reliance on *Weidenfeller* is misplaced. As defendants acknowledge, because the party who acted intentionally in that case "was not named as a defendant," *Weidenfeller* "did not address" whether an intentional tortfeasor "is entitled to apportionment" under the law. The plaintiff in *Weidenfeller*, after being injured during an unprovoked assault in a bar parking lot, sued — and obtained a verdict against — the bar and its owners based on their "negligence" in failing "to provide adequate lighting and a security presence." (*Weidenfeller*, *supra*, 1 Cal.App. 4th at p. 4.) Thus, as here relevant, the sole issue before the appellate court was whether the judgment against the *negligent* defendants for noneconomic damages should be reduced pursuant to section 1431.2 based on the percentage of fault the jury attributed to the assailant's intentional acts. (*Weidenfeller*, at p. 4.) The court's affirmative answer to that question did not, as defendants assert, "suggest[]" the converse, i.e., that intentional tortfeasors are entitled to reduce their liability based on the negligent acts of the plaintiff or other actors. This is clear from the fact that the court expressly distinguished *Godfrey* and *Allen* on the ground that they precluded "intentional actor[s]" from "shift[ing] [their] financial burden to a negligent party," and did not involve "the

converse situation" — at issue in *Weidenfeller* — where "transfer [of[ the intentional actor's responsibility to the negligent tortfeasor" is sought. (*Weidenfeller*, at p. 7.)

But the *Weidenfeller* court did not merely distinguish *Godfrey* and *Allen*, it endorsed and ultimately relied on their holding that intentional tortfeasors may not shift liability to negligent actors. In seeking to preclude reduction of the negligent defendants' liability under section 1431.2, the plaintiff in *Weidenfeller* argued that the statute did not apply because (1) "[c]omparative fault principles . . . are inapplicable whenever one party . . . acted intentionally," (2) his assailant's "conduct was intentional," and (3) his lawsuit therefore was "not an action '*based upon principles of comparative fault*'" within the meaning of the statute. (*Weidenfeller*, *supra*, 1 Cal.App.4th at p. 5.) In rejecting this argument, the Court of Appeal reasoned in part that the plaintiff's interpretation would "distort[] the meaning" of the statute by precluding "a negligent tortfeasor" from invoking its benefits "where the other tortfeasors act intentionally." (*Id.* at p. 6.) This "absurd[]" result, the court explained, would "violate[] the commonsense notion" that an "intentional actor [should] bear full responsibility for its act" (*ibid.*) and "the common law determination that a party who commits intentional misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim or a joint tortfeasor" (*id.* at p. 7). These principles, the court stated, are "reflected in the Legislature's enactment of

Code of Civil Procedure section 875," which expressly "preclud[es] contribution for 'any tortfeasor who has intentionally injured the injured person' " (*Weidenfeller*, at p. 6), and in *Godfrey* and *Allen,* which held "that an intentional actor cannot rely on someone else's negligence to shift responsibility for his or her own conduct" (*Weidenfeller*, at pp. 6–7). Given these authorities, the court concluded, "[t]here is no principled basis" for construing the statute to allow an "injured party . . . to transfer the intentional actor's responsibility to the negligent tortfeasor." (*Id.* at p. 7.) As this analysis shows, *Weidenfeller* actually provides further support for the view that, under existing principles of comparative fault, intentional tortfeasors are not entitled to reduction of their liability based on the negligent acts of others.

For similar reasons, the post-Proposition 51 decisions cited by amici curiae on behalf of defendants — the Association of Southern California Defense Counsel and the Association of Defense Counsel of Northern California and Nevada — do not constitute contrary authority. As amici curiae note, in *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1233 (*Rosh*), the court stated that "the comparative fault doctrine . . . is designed to permit the trier of fact to consider all relevant criteria in apportioning liability" and allows jurors to " 'evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility).' " (*Rosh*, at p.

1233.) As amici curiae also note, in *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 151 (*Scott*), the court, after declaring itself to be "in accord with" *Weidenfeller*, stated: "It follows that in *all* cases in which a negligent actor and one or more others jointly caused the plaintiff's injury, the jury should be instructed that, assuming 100 percent represents the total causes of the plaintiff's injury, liability must be apportioned to each actor who caused the harm in direct proportion to *such actor's respective fault*, whether each acted intentionally or negligently or was strictly liable [citations], and whether or not each actor is a defendant in the lawsuit . . . ." (Some italics omitted.)

But *Rosh* and *Scott*, like *Weidenfeller*, involved *negligent* tortfeasors seeking to reduce their liability based on the intentional acts of a third party. (*Scott, supra,* 27 Cal.App.4th at pp. 133–134; *Rosh, supra,* 26 Cal.App.4th at pp. 1229, 1232–1233.) Given this context, and the rule that " 'cases are not authority for propositions not considered' " (*American Federation of Labor v. Unemployment Ins. Appeals Bd., supra,* 13 Cal.4th at p. 1039), the statements on which amici curiae rely are not authority for the proposition that *intentional* tortfeasors may, under existing principles of comparative fault, shift liability to negligent actors. Indeed, to view *Scott* more broadly would be to ignore the fact that the *Scott* court primarily relied on *Weidenfeller* and that *Weidenfeller*, for reasons explained above, actually supports the conclusion that under existing

37

California principles of comparative fault, intentional tortfeasors are not entitled to reduce their liability based on the negligent acts of others.  Finally, *Scott*'s statement that "the jury should be instructed" to make an allocation of responsibility as to "each actor who caused the harm in direct proportion to such actor's respective fault (*Scott*, at p. 151, italics omitted) says nothing about whether *the judgment* the court later enters against an intentional actor should be in the amount of the plaintiff's entire damages — i.e., joint and several — or in an amount reduced to reflect the jury's allocation.  Under *Scott*'s holding that "a negligent actor" is entitled to have its liability reduced based on the acts of intentional tortfeasors (*ibid.*), the jury *must* make an allocation of responsibility as to those intentional tortfeasors, or there would be no basis for making the reduction of the *negligent* defendant's liability.  *Scott*'s direction that juries be instructed to make such allocations therefore does *not* imply that the eventual judgment the court later enters *against any intentional tortfeasors* should also be reduced in accordance with the jury's allocation.

The preceding discussion demonstrates that California principles of comparative fault have never required or authorized the reduction of an intentional tortfeasor's liability based on the acts of others.  Because section 1431.2, subdivision (a), incorporates those "principles of comparative fault," we agree with plaintiffs that the statute does not entitle Aviles to

reduce his liability based on the acts of Burley or the other defendants.

## C. *Other Indicia of Intent*

In addition to the language of section 1431.2 itself, defendants rely on several other sources to support their view that section 1431.2 provides for reduction of an intentional tortfeasor's liability based on the negligent acts of others. For reasons explained below, we disagree.

### 1. *Section 1431.1*

Invoking the principle that courts should construe a statute's language, not "in isolation, but in the context of the statutory framework as a whole" (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165), defendants argue that the findings and declarations the voters codified in section 1431.1 when they adopted Proposition 51 "confirm[]" section 1431.2's "application to all defendants no matter the nature of their fault." The former section, defendants argue, "makes no exception for any category of defendants, declaring in relevant part: 'The legal doctrine of joint and several liability . . . has resulted in a system of inequity and injustice'; it further states that 'to remedy these inequities, defendants in tort actions shall be held financially liable in closer proportion to their degree of fault. To treat them differently is unfair and inequitable.' " According to defendants, "[t]he only way to fulfill Proposition 51's purpose of ensuring that 'defendants in tort actions shall be held

financially liable in closer proportion to their degree of fault' (Civ. Code, § 1431.1) is to treat intentional and negligent tortfeasors equally."

For several reasons, defendants' argument is unpersuasive. First, it presumes that the word "fault" in section 1431.1 includes intentional conduct. However, as explained above, at the time the voters considered Proposition 51, the word "fault" in tort law generally — and in the comparative fault context in particular — included negligent (even willful) conduct and liability based on strict liability, but not intentional conduct. And section 1431.1, like section 1431.2, contains no reference to intentional conduct.

Second, defendants fail to explain how or why it would be " 'unfair' " or " 'inequitable' " to treat those who *intentionally* commit tortious acts differently from those who act negligently or whose responsibility arises from principles of strict liability. As previously explained, before and after Proposition 51's passage, California law, both common and statutory, has treated intentional tortfeasors differently from negligent and strictly liable tortfeasors with respect to the doctrines of contributory negligence and contribution. In this regard, it is notable that Proposition 51 did not even mention Code of Civil Procedure section 875, which since 1957 has established "a right of contribution among" multiple "defendants in a tort action"

(*id.*, subd. (a)), but has expressly *denied* that right to intentional tortfeasors (*id.*, subd. (d)).

Third, defendants also fail to explain how intentional tortfeasors fit within the category of defendants that section 1431.1 identifies as needing relief: " 'deep pocket' " entities and individuals (*id.*, subd. (a)) "included in lawsuits even though there [is] little or no basis for finding them at fault," simply because they are "perceived to have substantial financial resources or insurance coverage" (*id.*, subd. (b)).  As to those committing intentionally tortious conduct that inflicts injury, it can hardly be said there is "little or no basis for finding them at fault." (*Ibid.*)  As for the financial ability of such defendants to pay damages, when Proposition 51 was adopted, California law, as it does today, precluded insurance coverage "for loss intentionally caused by the insured." (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 904, citing Ins. Code, § 533 [insurers are "not liable for a loss caused by the wilful act of the insured"], and Civ. Code, § 1668 ["contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for . . . willful injury to the person . . . of another . . . are against the policy of the law"].)  For these reasons, we see nothing in the findings and declarations set forth in section 1431.1 that signals an intent to change long-standing law regarding intentional tortfeasors or that convinces us to alter our construction, based on that long-standing law, of section 1431.2's language.

2. *Unpassed Bill*

Defendants also base their reading of section 1431.2 on the difference between its language and that of an unpassed statute, introduced in the Legislature about four months before Proposition 51's passage, that addressed apportionment of noneconomic damages. The proposed statute, defendants emphasize, contained the following "exception for intentional tortfeasors: 'The allocation provided for by this section shall not apply to any person who intentionally injures another.' " (See Assem. Bill No. 4271 (1985–1986 Reg. Sess.) as introduced Feb. 21, 1985, § 2.) "[B]y contrast," defendants assert, "[n]othing in the text of section 1431.2, subdivision (a) qualifies or modifies the phrase 'each defendant' in a manner that excludes defendants found liable for an intentional tort." Thus, the drafters of Proposition 51 "included," and the voters "approved," "no exception" for intentional tortfeasors, and this court " 'cannot create' " one absent " 'an explicit legislative intention to do so.' "

Defendants' argument is unpersuasive. As we have stated, " 'legislative antecedents' " of an initiative statute that were " 'not directly presented to the voters . . . are not relevant' " in construing the statute. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 904–905.) Nor is the " 'motive or purpose of [an initiative's] drafters . . . relevant to its construction, absent reason to conclude that the [voters were] aware of that purpose

and believed the language of the proposal would accomplish it.' " (*Id.* at p. 904.) Moreover, defendants' argument ignores a significant textual difference between section 1431.2 and the unpassed statute. The latter did not contain the qualifying phrase in the former that is at the heart of this case — "based upon principles of comparative fault" (§ 1431.2, subd. (a)) — but instead broadly provided, without qualification, for allocation of noneconomic damages "[i]n an action for personal injury, property damage or wrongful death where an indivisible injury has been sustained by the plaintiff as a proximate result of the wrongful conduct of two or more persons" (Assem. Bill No. 4271 (1985–1986 Reg. Sess.) as introduced Feb 21, 1986, § 2). As plaintiffs argue, in light of the proposed statute's broad and unqualified language, a provision "specifically refer[ring] to intentional tortfeasors" would have been called for were the intent "to exclude them from benefiting from apportionment." As our prior analysis demonstrates, because section 1431.2, subdivision (a), calls for apportionment "based upon principles of comparative fault," the absence of an express exclusion for intentional tortfeasors does not have the significance defendants assert. As our prior analysis also demonstrates, adopting defendants' construction would render this additional phrase without meaning.

Moreover, defendants' argument is inconsistent with several California decisions involving section 1431.2, subdivision (a). For example, although that section is silent

regarding defendants who are liable both vicariously and based on their own negligence, in *Diaz, supra*, 51 Cal.4th at pages 1159–1160, we construed the statute, consistent with an express provision of *the same unpassed bill* on which defendants here rely, to preclude allocation of a share of liability based on the defendant's negligence, where the defendant admits to vicarious liability for negligent acts of its employee. And in *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 856, the court, in holding that apportionment under section 1431.2 applies to strict liability claims, rejected the plaintiff's reliance on the fact that the statute makes no express reference to such claims, unlike proposed but "unenacted" statutes that "explicitly prescribed the application of comparative fault principles to claims sounding in strict products liability." Such claims, the court reasoned, "are of a type clearly understood at the time of [Proposition 51's] enactment to fall within the description chosen," i.e., an " 'action for personal injury, property damage, or wrongful death, based upon principles of comparative fault.' " (*Wilson*, at p. 586, quoting § 1431.2, subd. (a)) By contrast, as we have demonstrated, an intentional tort claim clearly is not of such a type. For all of these reasons, defendants' reliance on the fact that section 1431.2, unlike the unpassed statute, does not contain an express exclusion for intentional tortfeasors, is unpersuasive.

### 3. *Ballot Materials*

Defendants also argue that, to the extent section 1431.2's text is ambiguous, "[t]he official Proposition 51 ballot materials confirm that the voters intended [the statute] to apply to all defendants, without exception." Defendants base their argument principally on the following: (1) the statement of the Legislative Analyst that "[t]his measure . . . limits the liability of each responsible party in a lawsuit to that portion of non-economic damages that is equal to the responsible party's share of fault" (Ballot Pamp., Primary Elec. (June 3, 1986) analysis of Prop. 51 by Legis. Analyst, p. 32 (Ballot Pamphlet)); and (2) the *absence* "in the ballot materials" of "the terms 'intent' or 'intentional' " or of any "mention" that there were "exceptions to Proposition 51's applicability" or that "the actions subject to Proposition 51 were limited to only those 'based upon' principles of comparative fault."

Again, for several reasons, defendants' arguments are unpersuasive. First, as explained earlier, we have previously rejected the argument that, in light of the statutory language, the statute makes reduction of liability available to all defendants, without exception. (*Diaz*, *supra*, 51 Cal.4th at p. 1156–1150.) The broad and general statement of the Legislative Analyst on which defendants rely does not convince us we should now hold otherwise. In this regard, we note that that statement is also overbroad insofar as it refers to limiting

liability of responsible parties "in a lawsuit." (Ballot Pamp., *supra,* analysis of Prop. 51 by Legis. Analyst, p. 32.) By its terms, section 1431.2, subdivision (a) applies, not in any lawsuit, but only in "action[s] for personal injury, property damage, or wrongful death." "[T]he generality and brevity of the Legislative Analyst's commentary . . . cannot plausibly be viewed as implicitly [expanding] the scope of the statute in the manner advocated by defendants." (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 308 [construing Health & Safety Code provisions enacted through initiative.)

Second, contrary to defendants' argument, the ballot materials did, in fact, inform voters that application of section 1431.2, subdivision (a), was subject to "principles of comparative fault." Those materials included the text of the proposed statute itself, including the phrase "based upon principles of comparative fault." (See Ballot Pamp., *supra,* text of Prop. 51, § 4, p. 33.) That the phrase was not mentioned in any of the accompanying commentary or arguments is not a basis for expanding the statute's application. (See *DaFonte, supra,* 2 Cal.4th at p. 602 [ballot arguments and analyses, though sometimes helpful in resolving ambiguities in an initiative measure, "cannot vary its plain import"].)

Third, in several respects, the comments in the ballot materials, though not expressly referring to liability for intentional torts, suggest that Proposition 51 was directed at

other types of tort liability. The Attorney General's "Official Title and Summary" stated that (1) "[u]nder existing law," where a plaintiff obtains a damage award "against multiple defendants," "[a] defendant paying all the damages may seek equitable reimbursement from other defendants," and (2) "[u]nder" the proposed law, "this rule" would "[c]ontinue[] to apply to 'economic damages.' " (Ballot Pamp., *supra*, Official Title and Summary of Prop. 51, p. 32.) These comments describe the state of California law, both before and after Proposition 51's adoption, only with respect to liability for *non*intentional torts. As we have previously explained, at the time of Proposition 51's adoption, both statutory and common law *precluded* intentional tortfeasors from "seek[ing] equitable reimbursement from other defendants." (Ballot Pamp., *supra*, Official Title and Summary of Prop. 51, p. 32.) And Proposition 51 did nothing to alter that preclusion and allow intentional tortfeasors to seek equitable indemnity for economic damages.

Comments in the Legislative Analyst's analysis similarly refer to California law as it applied only to nonintentional torts. In explaining the measure's background, the analysis stated that in "a lawsuit" by "someone [who] is injured or killed, or suffers property damage," "[i]f the court finds that the injured party was partly responsible for the injury, the responsibility of the other party is reduced accordingly." (Ballot Pamp., *supra*, analysis of Prop. 51 by Legis. Analyst, p. 32.) As previously explained, under California law as it existed when the voters

adopted Proposition 51, this accurately described the rule in cases involving negligence and strict liability, but *not* in cases involving intentional torts; in the latter context, the law precluded intentional tortfeasors from reducing their liability based on the injured party's conduct. In this respect, the comments of the Legislative Analyst, like those of the Attorney General, suggest that Proposition 51 was directed at liability for nonintentional torts.

Nothing in the ballot arguments — either pro or con — persuades us that Proposition 51's scope is, or was intended to be, broader. In arguing that section 1431.2 makes reduction of liability available to all defendants regardless of the basis for liability, defendants cite the statement in the argument in favor of the measure that taxpayers and consumers ultimately pay the costs of "huge 'deep pocket' court awards" — "through high taxes, increased costs of goods and services, and reduced governmental services" — "[r]egardless of whether it is a city, county or private enterprise." (Ballot Pamp., *supra*, argument in favor of Prop. 51, p. 34.) But this statement merely suggests that the universe of defendants to which the statute *may* apply includes cities, counties, and private enterprises; it does not suggest that such defendants may invoke the statute even when they commit intentionally tortious conduct. Notably, immediately after the statement defendants cite, the argument in favor of the measure, in explaining "[h]ow . . . the 'deep pocket' law work[s]," discussed a hypothetical "*ACCIDENT VICTIM*"

who, after being injured when a drunk driver runs a red light and hits another car, seeks recovery from a city for having a "faulty" stop light. (*Ibid.*) Similarly, the argument against the measure explained that Proposition 51 would "scrap[]" the existing system for allocating fault among "everyone found guilty [of having] caused [an] *accident* to occur," which "put[s] the responsibility where it belongs: not on innocent victims, but on drunk drivers, manufacturers of dangerous products or toxic waste and unsafe roads and highways." (Ballot Pamp., *supra*, argument against Prop. 51, p. 35, italics added.) These statements do not suggest that the measure's scope included liability for intentionally tortious conduct, or hinted to voters that if they were injured in a criminal attack, and either they or someone else negligently contributed to their injury, they would no longer be able to fully recover from the perpetrator. "One could reasonably expect [that] a change [in the law] of this magnitude would be made clear in both legal text and ballot argument." (*People v. Anderson* (1987) 43 Cal.3d 1104, 1161; see *People v Valencia* (2017) 3 Cal.5th 347, 364 [" 'We cannot presume. . . the voters intended the initiative to effect a change in law that was not expressed or strongly implied in either the text of the initiative or the analyses and arguments in the official ballot pamphlet.' "].) For this reason, we are not persuaded that the failure of the ballot materials to expressly mention the measure's effect on intentional tortfeasors supports defendants' position.

Based on the preceding analysis, we hold that section 1431.2, subdivision (a), does not authorize a reduction in the liability of intentional tortfeasors for noneconomic damages based on the extent to which the negligence of other actors — including the plaintiffs, any codefendants, injured parties, and nonparties — contributed to the injuries in question.[4]

## III. DISPOSITION

For the reasons set forth above, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

---

[4] We express no opinion on whether negligent tortfeasors may, under section 1431.2, subdivision (a), obtain a reduction in their liability for noneconomic damages based on the extent to which an intentional tortfeasor contributed to the injured party's injuries. We also express no opinion on whether, for policy reasons, existing common law principles of comparative fault should be changed vis-à-vis intentional tortfeasors.

B.B. v. COUNTY OF LOS ANGELES

S250734

Concurring Opinion by Justice Liu

In Compton, on the evening of August 3, 2012, several witnesses called the police after they saw Darren Burley attacking a woman in the street. When police arrived and attempted to stop him, Burley resisted arrest; the police suspected that Burley was under the influence of drugs. Deputy David Aviles then pinned Burley to the ground while other officers beat him with a flashlight and tasered him repeatedly. Deputy Aviles pressed his knees on Burley's neck and back with the full weight of his 200-pound body. A witness saw Burley gasping for air. When Burley lost consciousness, none of the officers rendered aid. Burley never regained consciousness and died 10 days later.

Darren Burley was Black. By happenstance, we heard oral argument in this case one week after another Black man, George Floyd, was killed by a Minneapolis police officer who pressed his knee into Floyd's neck with the full weight of his body for 8 minutes and 46 seconds — an incident that galvanized protests in every state across the country and throughout the world. (Burch et al., *How Black Lives Matter Reached Every Corner of America*, N.Y. Times (June 13, 2020); Bender & Winning, *Antiracism Protests Erupt Around the World in Wake of George Floyd Killing*, Wall Street Journal (June 7, 2020).) In all likelihood, the only reason Darren Burley is not a household

name is that his killing was not caught on videotape as Floyd's was.

Sadly, what happened to these men is not happenstance. Variants of this fact pattern have occurred with distressing frequency throughout the country and here in California. (See, e.g., *People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1133 ["[Oscar] Grant protested, 'I can't breathe. Just get off of me. I can't breathe. I quit. I surrender. I quit.'"]; *Garlick v. County of Kern* (E.D.Cal. 2016) 167 F.Supp.3d 1117, 1134 ["[David] Silva was chest-down with weight on his back. . . . [T]hroughout the altercation, Silva was . . . yelling out 'help,' and 'help me.'"]; *Martinez v. City of Pittsburg* (N.D.Cal., Mar. 8, 2019, No. 17-cv-04246-RS) 2019 WL 1102375, p. *3 ["Once [Humberto] Martinez was secured, Elmore . . . continued to apply pressure to the side of Martinez's head and kept his knee on Martinez's upper back for approximately 30 seconds. . . . Eventually, one of the officers noticed that Martinez was turning purple, at which point they rolled him to his side and removed the handcuffs."]; *People v. O'Callaghan* (Mar. 13, 2017, B265928) 2017 WL 958396, p. *1 [nonpub. opn.] ["[Alesia] Thomas remarked, 'I can't move' and 'I can't breathe'" and officer "proceeded to kick Thomas three times in her lower abdomen"]; *C.R. v. City of Antioch* (N.D.Cal., June 25, 2018, No. 16-cv-03742-JST) 2018 WL 3108982, p. *2 [witness "testified that he heard [Rakeem] Rucks say at some point while he was on the ground, 'Get me up out of the dirt. I'm breathing dirt. It's hard to breathe.'"].)

Today's opinion holds that Civil Code section 1431.2 does not permit an intentional tortfeasor to offset liability for noneconomic damages based on the negligence of other actors. (Maj. opn., *ante*, at pp. 3–7, 49.) Thus, Burley's family may

recover the full amount of their noneconomic damages. But even as the wrongful death judgment here affords a measure of monetary relief to Burley's family, it does not acknowledge the troubling racial dynamics that have resulted in state-sanctioned violence, including lethal violence, against Black people throughout our history to this very day. (See Felker-Cantor, Policing Los Angeles: Race, Resistance, and the Rise of the LAPD (2018); Coates, Between the World and Me (2015); Baldwin, The Fire Next Time (1963).)

Wrongful death statutes trace their origins to the 19th century, when state legislatures, alarmed at the increasing rate of fatal workplace accidents, attempted to force corporations to compensate the family members of accident victims. (Malone, *The Genesis of Wrongful Death* (1965) 17 Stan. L.Rev. 1043, 1043; see *Hillbrand v. Standard Biscuit Co.* (1903) 139 Cal. 233 [wrongful death action by father and mother for death of their daughter while employed at biscuit factory]; *Daves v. Southern Pac. Co.* (1893) 98 Cal. 19 [wrongful death action for death of husband while repairing railroad].) The elements of a wrongful death action are the underlying tort (in this case, battery), a resulting death, and damages. (Code Civ. Proc., § 377.60; see *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968.) Although this tort encompasses the wrong inflicted on Burley and provides compensation to his family, it gives no hint that what happened here has a history. And reckoning with that history is necessary if we are to prevent the wrongful deaths of more African Americans in the future.

The Legislature has at times attempted to redress the specific harm of violence against African Americans. Burley's family has also sought relief under the Tom Bane Civil Rights

Act (Bane Act), which provides a right of action against a person who, whether or not acting under the color of law, violates "by threat, intimidation, or coercion" another person's federal or state rights. (Civ. Code, § 52.1, subd. (b).) The Bane Act was passed to " 'stem a tide of hate crimes' " against minorities in the 1980s. (*Venegas v. County of Los Angeles* (2004) 32 Cal.4th 820, 843.) In addition, the Ralph Civil Rights Act of 1976 (Ralph Act) forbids violence or intimidation "on account of" certain protected characteristics, including race. (Civ. Code, § 51.7, subd. (b).) These laws acknowledge the racial dimensions of acts of violence against African Americans. But in the excessive force context, applying the coercion element of a Bane Act claim has not been straightforward, as the Burley family's litigation in the Court of Appeal demonstrates. (*B.B. v. County of Los Angeles* (2018) 25 Cal.App.5th 115, 129–134.) And although the Ralph Act provides liability for intentional discrimination (*Gabrielle A. v. County of Orange* (2017) 10 Cal.App.5th 1268, 1291), one may ask what other measures are necessary given what we know about unconscious bias. (See Banks, Eberhardt & Ross, *Discrimination and Implicit Bias in a Racially Unequal Society* (2006) 94 Calif. L.Rev. 1169, 1182–1189.)

Moreover, the efficacy of these laws has sometimes been undermined by the very racial disparities they were meant to correct. When litigants have recovered damages, verdicts have often reflected racial disparities in income and health outcomes. Until the Legislature prohibited the practice this year, California juries routinely consulted tables estimating earning potential based on race and gender when awarding economic damages to prevailing plaintiffs. (Civ. Code, § 3361, added by Stats. 2019, ch. 136, § 2.) This "perpetuate[d] systemic

inequalities" and "disproportionately injure[d] women and minority individuals," who on average earn less than white men. (Stats. 2019, ch. 136, § 1; see Avraham & Yuracko, *Torts and Discrimination* (2017) 78 Ohio St. L.J. 661, 664.)

Nor should we assume that damages are enough to reliably deter police misconduct. Local jurisdictions must indemnify officers for any nonpunitive damages judgments or settlements in suits brought against them (with few exceptions), which effectively means that taxpayers foot the bill. (Gov. Code, §§ 825, subd. (a), 825.2.) And these payouts often come from law enforcement budgets specifically set aside for such purposes or from the local jurisdiction's general funds. (See Schwartz, *How Governments Pay: Lawsuits, Budgets, and Police Reform* (2016) 63 UCLA L.Rev. 1144, 1165; *id.* at p. 1241 [Los Angeles Sheriff's Department budgeted more than $35 million for lawsuit payouts annually between 2012 and 2014].) As a result, officers and their departments are often insulated from the financial consequences of their actions. (See Schwartz, *Police Indemnification* (2014) 89 N.Y.U. L.Rev. 885, 953.)

Separate from this action, Burley's family also sought redress under federal law, specifically 42 United States Code section 1983 (section 1983). (*T.E. v. County of Los Angeles* (C.D.Cal., Feb. 25, 2016, No. 15-cv-5826).) On several occasions, Congress has enacted civil rights statutes in response to law enforcement violence against African Americans. Although these laws, including section 1983, provide a measure of recognition that the police officer's knee on Darren Burley's neck is part of a legacy of anti-Black violence, their efficacy has been much debated. The Burley family's federal suit was dismissed because the statute of limitations had run (*T.E.*, at p. *1), but

even if the suit had gone forward, the family would have needed to overcome a number of hurdles in order to obtain relief.

Section 1983 provides a cause of action against state and local officials who violate individual constitutional and statutory rights while acting "under color of" state law.  (42 U.S.C. § 1983.)  After the Civil War, the Ku Klux Klan continued to terrorize African Americans in the South.  Beatings, lynchings, and destruction of Black-owned property were common, and local authorities and courts routinely refused to enforce state criminal laws against perpetrators and often participated in the violence themselves.  (See *Monroe v. Pape* (1961) 365 U.S. 167, 171, overruled in part by *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658; Gilles, *Breaking the Code of Silence:  Rediscovering "Custom" in Section 1983 Municipal Liability* (2000) 80 B.U. L.Rev. 17, 55.)  Congress enacted section 1983 to "interpose the federal courts between the States and the people," providing African Americans redress when the very officials sworn to protect them from violence were its perpetrators.  (*Mitchum v. Foster* (1972) 407 U.S. 225, 242; see Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13, as amended, 42 U.S.C. § 1983).)

But the doctrine of qualified immunity shields officials from liability under section 1983 so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  (*Harlow v. Fitzgerald* (1982) 457 U.S. 800, 818.)  To show that a right was clearly established at the time of the conduct, a plaintiff must identify precedent governing "the specific facts at issue" that has " 'placed the statutory or constitutional question beyond debate.' "  (*Kisela v. Hughes* (2018) 584 U.S. __, __, __ [138 S.Ct.

1148, 1153, 1152].)  Applying this standard, a federal appeals court has concluded that even if binding authority has held it is excessive force to unleash a police dog on a surrendering suspect in a canal in the woods, it is not necessarily clearly established that unleashing a police dog on a motionless suspect in a bushy ravine is excessive force.  (Compare *Priester v. City of Riviera Beach* (11th Cir. 2000) 208 F.3d 919, 927, with *Jones v. Fransen* (11th Cir. 2017) 857 F.3d 843, 854.)  Such examples have led one federal judge to observe that qualified immunity has allowed "public officials [to] duck consequences for bad behavior — no matter how palpably unreasonable — as long as they were the first to behave badly." (*Zadeh v. Robinson* (5th Cir. 2019) 928 F.3d 457, 479 (conc. & dis. opn. of Willett, J.), italics omitted.) Another federal judge, in a powerful and extensive account of the racial history of section 1983 and the continuing lack of accountability for police harassment and violence against African Americans, has noted that qualified immunity in its present form is "extraordinary and unsustainable."  (*Jamison v. McClendon* (S.D.Miss., Aug. 4, 2020, No. 3:16-cv-00595-CWR-LRA) 2020 WL 4497723, p. *29.)  Today there are numerous proposals to narrow or eliminate this judicially created limitation on section 1983 liability. (H.R. No. 7085, 116th Cong., 2d Sess. (2020); H.R. No. 7115, 116th Cong., 2d Sess. (2020); H.R. No. 7120, 116th Cong., 2d Sess. (2020); Sen. No. 4036, 116th Cong., 2d Sess. (2020); Sen. No. 4142, 116th Cong., 2d Sess. (2020); Sen. No. 3912, 116th Cong., 2d Sess. (2020).)

With respect to injunctions, high court precedent has constrained substantive review of police misconduct claims.  In *City of Los Angeles v. Lyons* (1983) 461 U.S. 95, the high court held that Adolph Lyons, a Black man pulled over and put in a

chokehold by Los Angeles police officers, did not have standing to seek an injunction against the use of chokeholds because he could not establish that he would again be subject to the same abuse. (*Id*. at p. 105.) Moreover, in order to hold municipalities liable for failure to train or supervise officers (often a necessary component of structural reform), the high court has held that a plaintiff must show that the department's conduct amounted to "deliberate indifference to the rights of persons." (*City of Canton v. Harris* (1989) 489 U.S. 378, 388.)

Another federal law allows the United States Department of Justice to sue police departments for engaging in a pattern and practice of constitutional rights violations. (34 U.S.C. § 12601, former 42 U.S.C. § 14141.) Enacted in 1994 as part of the Violent Crime Control and Law Enforcement Act (Pub.L. No. 103–322, 108 Stat. 1796), section 12601 revived a bill that was introduced in the aftermath of the police beating of Rodney King in Los Angeles. (See Gilles, *Reinventing Structural Reform Litigation: Deputizing Private Citizens in the Enforcement of Civil Rights* (2000) 100 Colum. L.Rev. 1384, 1401; compare 34 U.S.C. § 12601 with H.R. No. 2972, 102d Cong., 1st Sess., § 2 (1991).)

Since 1994, the United States Department of Justice has formally investigated 70 police departments and reached more than 40 agreements requiring departments to overhaul internal oversight measures, officer training, and disciplinary procedures. (Childress et al., *Fixing the Force*, Frontline PBS (2018), <https://www.pbs.org/wgbh/frontline/interactive/fixingtheforce/> [as of Aug. 7, 2020]. All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.) The structural

reforms resulting from federal intervention have shown signs of effectively "reduc[ing] officer uses of force, reduc[ing] civil liability for police misconduct, increas[ing] citizen satisfaction, and increas[ing] apparent compliance with legal norms." (Rushin & Garnett, *State Labor Law and Federal Police Reform* (2017) 51 Ga. L.Rev. 1209, 1213 [collecting empirical studies].) But such investigations and settlements are costly and depend on the political will of the governing federal administration. (See Bell, *Police Reform and the Dismantling of Legal Estrangement* (2017) 126 Yale L.J. 2054, 2129.) Under the current administration, the number of formal investigations launched by the Department of Justice has declined to just one, and the Department has sharply curbed enforcement of existing agreements. (See Childress, *supra*; Mazzone & Rushin, *State Attorneys General As Agents of Police Reform* (2020) 69 Duke L.J. 999, 1028–1029.)

A wrongful death judgment with substantial damages is one way of affirming the worth and dignity of Darren Burley's life, and I join today's opinion. But the racial dimensions of this case should not escape our notice. How are we to ensure that "the promise of equal justice under law is, for all our people, a living truth"? (Cal. Supreme Ct., Statement on Equality and Inclusion (June 11, 2020), <https://newsroom.courts.ca.gov/news/supreme-court-of-california-issues-statement-on-equality-and-inclusion>.) Whatever the answer, it must involve acknowledging that Darren Burley's death at the hands of law enforcement is not a singular incident unmoored from our racial history. With that acknowledgment must come a serious effort to rethink what racial discrimination is, how it manifests in law enforcement and the justice system, and how the law can

provide effective safeguards and redress for our neighbors, friends, and citizens who continue to bear the cruel weight of racism's stubborn legacy.


**LIU, J.**


**I Concur:**
**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  B.B. v. County of Los Angeles
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XX 25 Cal.App.5th 115
**Rehearing Granted**

_____

**Opinion No.** S250734
**Date Filed:**  August 10, 2020
_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Ross M. Klein

_____

**Counsel:**

Pine Tillet Pine, Norman Pine, Stacy Freeman, Scott Tillett, Chaya M. Citrin; The Sweeney Firm and John E. Sweeney for Plaintiffs and Appellants B.B. and B.B.

Schonbrun Seplow Harris & Hoffman, Michael D. Seplow, Paul L. Hoffman, Aidan C. McGlaze, John Washington; Orange Law Offices, Olu Orange; Antablin & Bruce, Drew Antablin; Douglas / Hicks Law, Carl E. Douglas and Jamon Hicks for Plaintiff and Appellant T.E. and for Plaintiffs and Respondents.

O'Melveny & Myers, Sabrina Heron Strong, Dimitri D. Portnoi, Jefferson J. Harwell; Manning & Kass, Ellrod, Ramirez, Trester, Eugene P. Ramirez, Louis W. Pappas, Steven J. Renick, Julie M. Fleming and Angela M. Powell for Defendants and Appellants.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Appellants.

Cole Huber and Derek P. Cole for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendants and Appellants.

Polsinelli, David K. Schultz, J. Alan Warfield; Mansukhani, Don Willenburg and Gordon Rees Scully for the Association of Southern California Defense Counsel and Association of Defense Counsel of Northern California and Nevada as Amici Curiae on behalf of Defendants and Appellants.

Shook, Hardy & Bacon, Mark A. Behrens, Cary Silverman and Patrick Gregory for Coalition for Litigation Justice, Inc. as Amicus Curiae on behalf of Defendants and Appellants.

Cole Pedroza, Curtis A. Cole, Cassidy C. Davenport and Bethany J. Peak for California Medical Association, California Dental Association and California Hospital Association as Amici Curiae on behalf of Defendants and Appellants.

The Arkin Law Firm and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Respondents.

Kazan, McClain, Satterly & Greenwood and Ted W. Pelletier for Michael and Cindy Burch as Amici Curiae on behalf of Plaintiffs and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Olu Orange
Orange Law Offices, P.C.
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(213) 736-9900, ext. 103

Norman Pine
Pine Tillett Pine LLP
14156 Magnolia Blvd., Ste. 200
Sherman Oaks, CA 91423-1182
(818) 379-9710

Sabrina H. Strong
O'Melveny & Myers, LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071-2899
(213) 430-6000